In re TELESPHERE COMMUNICATIONS, INC., Telesphere Network, Inc., Telesphere Limited, Inc., Debtors.

Bankruptcy Nos. 91 B 17581, 91 B 19188 and 91 B 19189.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Dec. 22, 1994.

Robert Fishman, Ross & Hardies, Chicago, IL, for debtors.

Larry Wolfson, Jay Geller, Jenner & Block, Chicago, IL, for Official Committee of Unsecured Creditors.

E. King Poor, Winston & Strawn, Chicago, IL, for Williams Telecommunications Group, Inc.

Marcia L. Goldstein, Sharon Youdelman, Sean McKenna, Weil, Gotshal & Manges, New York City, John Collen, Douglas B. Rosner, Sonnenschein, Nath & Rosenthal, Chicago, IL, Lawrence F. Flick, II, Blank, Rome, Comiskey & McCauley, Philadelphia, PA, for Chase Manhattan Bank, Citibank, N.A. and Bell Atlantic Tricon Leasing Corp.

## MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Bankruptcy Judge.

These administratively consolidated Chapter 11 cases have come before the court on the debtors' motion to approve a settlement of certain claims arising from a failed leveraged buyout. The settlement is supported by the debtors' major secured creditors and the unsecured creditors' committee. It is opposed by Tamona Enterprises, Inc., and fifty-five other general unsecured creditors, all of whom are parties in an action disputing the ownership of property claimed by the debtors' estates. After a hearing on the merits of the settlement and a review of the parties' submissions, the court gave an oral opinion and then took the matter under advisement in order to prepare this memorandum. For the reasons set forth below, the court finds that the settlement is in the best interest of the estates and accordingly grants the pending motion.

### Jurisdiction

As discussed below, the pending motion to approve settlement is essentially a motion to dispose of property of the estate. This proceeding is therefore within the jurisdiction of the district court pursuant to 28 U.S.C. § 1334(b) and (d), and may be referred to a bankruptcy judge pursuant to 28 U.S.C. § 157(a). The matter has been so referred pursuant to General Rule 2.33 of the United States District Court for the Northern District of Illinois. It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O), and so a bankruptcy judge may enter final judgment pursuant to 28 U.S.C. § 157(b)(1).

### Findings of Fact

*General background.* Telesphere Communications, Inc. ("TCI"), and its two subsidiaries, Telesphere Network, Inc. ("TNI"), and Telesphere Limited, Inc. ("TLI"), formerly known as National Telephone Services, Inc. ("NTS"), are related entities that were engaged in the telecommunications industry. On August 19, 1991, an involuntary petition for relief under Chapter 7 of the Bankruptcy Code (Title 11, U.S.C.) was filed against TCI. TM ¶ 1; TS ¶ A.[1] On September 11, 1991,

---

1. The relevant facts are principally drawn from the following sources:

 (a) Motion Of Telesphere Communications, Inc., Telesphere Network, Inc. And Telesphere Limited, Inc. For Entry Of An Order Pursuant To Federal Rule Of Bankruptcy Procedure 9019(a) Authorizing And Approving Agreement Compromising And Settling Claims And Causes Of Action And For Other Relief (hereinafter, "TM");

TCI consented to the petition for relief and converted the case to one under Chapter 11 of the Bankruptcy Code; at the same time, TNI and TLI filed their own voluntary petitions for relief under Chapter 11. *Id.* The three Chapter 11 cases have been administratively consolidated, and the three debtors are referred to, collectively, as "Telesphere."

Shortly after the orders for relief, Telesphere ceased doing business as an operating entity, and the bankruptcy cases have focused on the liquidation of Telesphere's assets. Among these assets are a number of avoidance claims. *See* TM ¶¶ 22, 23(R)(1)(c) & 23(R)(3); TS ¶¶ P, 3 & 10(d)(1 & 3). The proposed settlement deals with one group of such claims, arising out of TCI's 1990–91 leveraged buyout of NTS. *See generally* TM ¶¶ 1, 5–10, 18–20; TS ¶¶ N–P; TS ¶¶ A, E & F.

*The NTS transactions.* TCI decided to acquire the operator-service business of NTS in 1990, TM ¶ 5; TS ¶ E, and entered into an agreement, dated May 31, 1990, to purchase all of the capital stock of NTS from its shareholders, TM ¶ 5; Geller Ex. 1; Geller Trans. 28, 43. The largest of these shareholders, owning some 85% of the outstanding stock of NTS, was Ronald Haan, who was also NTS's president. TM ¶ 5.

TCI did not immediately consummate the stock purchase agreement. Instead, it arranged for an initial payment to be made to Haan separate from the payment that Haan would receive for his stock. This payment was effectuated through a fairly complicated multiparty transaction. First, TCI obtained from Williams Telecommunications Group, Inc. ("WTG") a "bridge loan" in the amount of $26.8 million (the "WTG loan"), guaranteed by Francesco Galesi, an insider of TCI. Obj. 11; Geller Trans. 62–63. Second, TCI loaned the proceeds of the WTG loan to NTS (the "NTS loan"). TM ¶ 5; TS ¶ E; Geller Trans. 43, 63. Third, NTS distributed the proceeds of the NTS loan to Haan, in satisfaction of an asserted loan of approximately $23 million owed by NTS to Haan (the "Haan loan") and a $3 million prepayment penalty incorporated into the Haan loan. TM ¶ 5; TS ¶ E; Geller Trans. 43. Fourth, as collateral for the NTS loan, Haan pledged to TCI all of his stock in NTS and in another corporation. TM ¶ 6; *see* Geller Trans. 47. Finally, TCI provided as collateral for the WTG loan, among other things, assignments to WTG of the pledges of Haan's stock and the note evidencing the NTS loan. TM ¶ 6; TS ¶ E; *see* Geller Trans. 47.

On or about October 11, 1990, in order to complete the purchase of the NTS shares as well as to finance its own business operations, *see* Geller Trans. 43–44, 69–70, Telesphere entered into a financing arrangement with The Chase Manhattan Bank, N.A. ("Chase"), Citibank, N.A. ("Citibank"), and Bell Atlantic ("Bell Atlantic") (collectively, the "Lenders"). TM ¶ 8; TS ¶ E; Geller Ex. 2; Geller Trans. 28. Under this arrangement, TNI and NTS borrowed $94 million (the "Lenders' loan"), and TCI guaranteed the repayment. TM ¶ 8; TS ¶ E; Geller Ex. 2. As additional security, TCI, TNI, and NTS all granted the lenders security interests in their accounts, general intangibles, documents, instruments, and equipment, as well as the proceeds of this property (collectively, the "prepetition collateral"). TM ¶ 10; TS ¶ F; Geller Exs. 3–5; Geller Trans. 28–29.

On October 15, 1990, with its financing in place, TCI set aside $1.3 million of the Lenders' loan for working capital and then com-

(b) Agreement Compromising And Settling Claims And Causes Of Action (hereinafter, "TS");
(c) The Objection of Tamona Enterprises, Inc. to the settlement motion (hereinafter, "Obj.")
(d) Testimony of Jay S. Geller appearing in Transcript of November 4, 1993 (hereinafter, "Geller Trans.");
(e) Testimony of Joseph Nemmers appearing in Transcript of November 4, 1993 (hereinafter, "Nemmers Trans.");

(f) Testimony of Robert M. Fishman appearing in Transcripts of November 4, 1993 and 5, 1993 (hereinafter, "Fishman Trans.");
(g) Colloquy with counsel appearing in Transcript of November 22, 1993 (hereinafter, "Counsel Trans.");
(h) Trial exhibits introduced during the examination of Jay S. Geller on November 4, 1993 ("Geller Ex.").

pleted the purchase of the NTS stock. Geller Trans. 43–44 & 69–70. In that stock acquisition, TCI made the following payments (Geller Trans. 69–70):

| Payment Recipient | Payment's Purpose | Approximate Amount |
|---|---|---|
| WTG | Retirement of WTG loan | $26,800,000 |
| NTS shareholders | Purchase of NTS stock | 21,000,000 |
| Lenders and others | Payment of professional fees | 6,000,000 |
| NTS secured creditors | Satisfaction of prior working capital facilities | 37,300,000 |
| NTS lessor | Prepayment of, or cure of arrearages on, NTS lease | 1,600,000 |
| | | $92,700,000 |

In January, 1991, shortly after consummating the NTS acquisition, Telesphere discovered that it had inadequate working capital. Geller Trans. 51–53. To address this problem, Telesphere periodically requested that the Lenders provide additional financing for its working capital needs. Geller Trans. 51–53. The Lenders agreed to do so, eventually providing Telesphere with $10.7 million in addition to the original $94 million loan. Geller Trans. 51–53 & 112; *see* Fishman Trans. at 175.

*The Lenders' postpetition financing.* The involuntary bankruptcy petition that led to the pending bankruptcy cases was filed on August 19, 1991, about ten months after the conclusion of the NTS transaction. Shortly thereafter, on September 13 and October 17, 1991, Telesphere and the Lenders agreed to Telesphere's use of the proceeds of the prepetition collateral pursuant to Section 363 of the Bankruptcy Code. TM ¶ 12; TS ¶ H. As adequate protection for this use of collateral, the Lenders received (1) continuing and replacement security interests in the prepetition collateral to the extent the collateral was subject to valid security interests of the Lenders prior to August 19, 1991 (the date of the commencement of the involuntary proceedings against TCI); and (2) security interests in (a) all accounts receivables of Telesphere generated after August 19, 1991; (b) all property of Telesphere acquired after August 19, 1991; and (c) all property of Telesphere not otherwise encumbered as of August 19, 1991 by valid, perfected, and enforceable liens and security interests (collectively, the "postpetition collateral"). TM ¶ 12; TS ¶ H.

*The liquidation of Telesphere's assets.* In October, 1991 Telesphere determined to liquidate its assets. TM ¶ 13; TS ¶ I. After a contested hearing, Telesphere was authorized to sell substantially all of the assets used in the operation of its business pursuant to Section 363. TM ¶¶ 13–16; TS ¶¶ I–L. As noted above, that sale closed on November 1, 1991. It realized proceeds of $17 million, of which $12 million (the "sales escrow") has been held in segregated accounts at Chase. TM ¶¶ 13–17; TS ¶¶ I–M.

After consummating the November 1, 1991 sale, Telesphere began to liquidate claims of the estates. As of the time of the hearing on the pending motion, that process had led to the collection of unencumbered cash in the amount of approximately $4 million ("Telesphere's general funds"). *Compare* Nemmers Trans. at 115 *with* Counsel Trans. at 5–6. It has also led to the commencement of numerous adversary proceedings which collectively name several hundred defendants in an effort to obtain recoveries of millions of dollars.

*The investigation of the NTS transaction.* In early November, 1991 the unsecured creditors' committee (the "Committee") began to investigate the existence of potential claims against the Lenders and WTG, among others, as a result of the NTS acquisition. Geller Trans. 21–22 & 29–43; *see* TM ¶ 19; TS ¶ N. Though the Committee did not take

any formal discovery, Geller Trans. 35–41, 84 & 123–25, it did obtain voluntary production of a substantial amount of information regarding the NTS transaction, primarily from the Lenders. Geller Trans. 29–40. Based on this informal discovery and its own legal research, *see* Geller Trans. 29–43, the Committee concluded that Telesphere had claims against the Lenders and WTG, among others, arising from the NTS transaction, TM ¶ 19; TS ¶ N. The Committee, then, with Telesphere's consent, began settlement negotiations with the Lenders and WTG. *See* Geller Trans. 80–84 & 94–98. Those negotiations led to the pending settlements. *See* Geller Trans. 93–98.

*The settlement with WTG.* Though presented as a single package, the settlement consists of two largely separate compromises—one with WTG and the other with the Lenders. In each of the compromises, Telesphere gives up claims it may have against the other parties, and the other parties provide the estate with either cash consideration; waivers, reductions, or subordination of claims; or both. There has been no objection to the settlement with WTG. The essential features of that compromise are that Telesphere covenants not to sue WTG on any claims arising from the NTS transaction, the Telesphere bankruptcy cases, and certain other commercial transactions Telesphere had with WTG, TS ¶ 6(g), and, in exchange, WTG agrees:

(1) to reduce from $4.1 million to $1.7 million the amount of its administrative claim (with the reduced claim proposed to be allowed), TS ¶ 6(d);

2. Counsel for the Committee testified that the reduction of the allowed amount of WTG's administrative claims has a value of approximately $2.4 million. *See* Geller Trans. 101–02; Fishman Trans. at 208–11. That testimony also indirectly indicates that the partial subordination of WTG's reduced administrative claim has a worth of nearly $400,000. *Compare* TS ¶¶ 6(d) & 10 (amount, time, manner, and source of payment of WTG's reduced administrative claim) *with* TS ¶¶ 5(b) & 10 (amount, time, manner, and source of payment of bank loan) and Geller Trans. 109–10 & 126 (valuation of bank loan).

3. In addition to the claim waiver, Telesphere agreed to provide the Lenders with two other items of consideration, neither of which appears

(2) to partially subordinate the reduced administrative claim, TS ¶¶ 6(d) & 10; and

(3) to waive its entire $190 million general unsecured claim, TS ¶ 6(c).

The trial testimony indicates that the reduction and partial subordination of WTG's administrative claim would benefit the estate in the amount of about $2.8 million.[2] Furthermore, Committee counsel testified that the value of the waiver of WTG's general unsecured claim was in the range of $500,000 to $4 million, but this value depends on the extent of the estate available for payment to unsecured creditors, an issue discussed below at p. 563 and pp. 564–65. There is no direct evidence concerning the value of the claims against WTG that Telesphere has agreed to give up.

*The settlement with the Lenders.* The compromise with the Lenders is more complex than the one with WTG. *See generally* TS ¶¶ 5–6 & 9–10. As with WTG, Telesphere agrees to give up claims against the lenders; specifically, Telesphere would waive all claims against the Lenders arising in connection with the NTS transaction and the bankruptcy cases (including claims under Section 506(c) of the Bankruptcy Code for reimbursement of expenses in connection with liquidating the Lenders' collateral). TS ¶ 6(k).[3] The question of the value of these waived claims is one of the major issues of dispute between the parties, and is addressed below at pp. 554–64.

In exchange for the waiver, the Lenders agree to provide the following consideration, with the values indicated by the evidence as follows:

to have substantial cost to the estates. First, the estates give up any claim to the remaining proceeds of the Section 363 sale, held in the sales escrow. These funds, however, are clearly encumbered by the liens imposed as part of the adequate protection for the debtors' use of prepetition collateral, and thus the estates had no substantial claim to these proceeds. Second, the Lenders are given the option of requiring the Telesphere to pursue collection of a $1.44 million promissory note. If the note has value, it would be in the estates' interest to pursue collection of the note in any event, since collection of the note would reduce the Lenders' claims against other estate assets.

| Consideration | Approximate Monetary Value to the Estates | Basis for Estimation of Monetary Value |
|---|---|---|
| 1. Cash payment (the ("settlement payment"). TS ¶ 5(a). | $2,800,000 | Geller Trans. 101–02 & 125–26; Fishman Trans. at 208–11. |
| 2. Cash proceeds from newly made, partially subordinated $1.5 million loan (the "bank loan"). TS ¶¶ 5(b) & 10. | $ 400,000 | Geller Trans. 109–10 & 126; Fishman Trans. at 208–11. |
| 3. Waiver of claims to, release of security interest in, and remission by Chase of funds held to satisfy Telesphere's taxes ("Chase tax funds"). TS ¶¶ 5(c)(i) & 6(a)(ii). | $1,100,000 | Geller Trans. 101–02 & 128; Fishman Trans. at 208–11. |
| 4. Waiver of claims to and release of security interest in funds held by Telesphere to satisfy its tax obligations. ("Telesphere's tax funds"). TS ¶ 6(a)(ii). | Included in Item 3, above. | *See* Geller Trans. 101–02 & 128; Fishman Trans. at 208–11. |
| 5. Waiver of claims to and release of security interest in funds held by Telesphere as part of its miscellaneous receipts ("miscellaneous receipts"). TS ¶ 6(a)(ii). | Included in Item 3, above. | Geller Trans. 101–02 & 128; Fishman Trans. at 208–11. |
| 6. Waiver of claims to, release of security interest in, and remission by Chase of funds relating to that portion of proceeds collected from Telesphere's accounts receivables in excess of requirements of cash collateral order ("excess postpetition proceeds"). TS ¶¶ 5(c)(ii) & 6(a)(ii). | $ 200,000 | Geller Trans. 101–02 & 127; Fishman Trans. at 208–11. |
| 7. Waiver of administrative claims for postpetition interest, attorneys fees, and expenses. TS ¶ 6(a)(i). | $–0– | *Compare* Geller Trans. 51–52 (Lenders are expected to have a deficiency claim) *with* Section 506(b) of the Bankruptcy Code (secured creditor entitled to postpetition interest, attorney fees, and expenses only to the extent that collateral exceeds value of secured claim). |
| 8. Assignment of all claims to, and rights to receive distributions of, amounts owed by Telesphere on account of its subordinated debentures. TS ¶ 5(e). | $–0– | There is no evidence indicating that this assignment is of any ascertainable value. *See* Geller Trans. at 100–01; TS ¶ G. |

The settlement with the Lenders also sets forth an agreed treatment of the Lenders' unsecured deficiency claims, the economic impact of which is not clearly shown by the evidence. This treatment has three steps: (1) the Lenders agreed that two of them (Chase and Citibank) would assert the deficiency claims, while the third (Bell South) would waive its right to a deficiency claim, TS ¶ 6(b) and (j); (2) the deficiency claims would be allowed in the amount of $38 million, which is said to be a reduction, TS ¶ 6(b); and (3) the allowed deficiency claim would be subordinated to the payment of $6.7 million to other claims, expected to be general unsecured claims, according to a somewhat complex arrangement, TS ¶¶ 5(f), 10(b) & (c); Geller Trans. at 106.[4] Counsel for the Committee did estimate the value of this subordination at $2.2 million, Geller Trans. 102–03, 128–29, but, again, the extent of the value of the subordination depends on the extent of funds available for distribution to unsecured creditors.

*The status of the objecting parties.* The only parties who have objected to the proposed settlement are Tamona Enterprises, Inc., and fifty-five similarly situated general unsecured creditors (collectively referred to as "Tamona"). All of the Tamona objectors are represented by the same attorneys and all are plaintiffs in an adversary proceeding claiming equitable ownership of certain funds obtained by Telesphere during its operation. The adversary proceeding is further described in this court's decision awarding summary judgment in favor of Telesphere. *Almar Communications, Ltd. v. Telesphere Communications, Inc. (In re Telesphere Communications, Inc.)*, 167 B.R. 495 (Bankr. N.D.Ill.1994).

### Discussion

#### A. Settlement approval standards.

The requirement for court approval of settlements has an uncertain basis. There is a substantial body of authority holding that a bankruptcy judge "must apprise himself of all facts necessary to evaluate [a] settlement

and make an 'informed and independent judgment' about the settlement." *In re American Reserve Corp.*, 841 F.2d 159, 162 (7th Cir.1987), citing *Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424, 434, 88 S.Ct. 1157, 1163, 1168, 20 L.Ed.2d 1 (1968), and *In re A & C Properties*, 784 F.2d 1377, 1383 (9th Cir.), *cert. denied, Martin v. Robinson*, 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986). These authorities, however, appear to be grounded in pre-Code decisions which reflect the encompassing administrative role of the bankruptcy court under the Bankruptcy Act of 1898. *TMT Trailer Ferry*, for example, is a pre-Code decision stating that it is essential for "every important determination in reorganization proceedings" to receive the independent judgment of the bankruptcy court. 390 U.S. at 424, 88 S.Ct. at 1163.

The Code itself rejects this view of the role of the bankruptcy court; indeed, one of the express purposes of the Code was to remove the bankruptcy judge from general estate administration, giving that task to the newly created office of United States Trustee. The House Report on the legislation that became the Bankruptcy Code states that the Code provides for a "separation of judicial and administrative functions currently performed by the bankruptcy judges," with the judges acting as "passive arbiters of disputes that arise in bankruptcy cases" and the United States trustees assuming "the bankruptcy judge's current supervisory roles." H.R.Rep. No. 595, 95th Cong., 1st Sess. 107 (1977), U.S.Code Cong. & Admin.News 1978, 5787, 6069.

▮ Consistent with this legislative purpose, the Bankruptcy Code contains no requirement for judicial approval of settlements. *See In re Lee Way Holding Co.*, 1990 U.S.Dist. LEXIS 20228 at *12 ("[T]here is no specific Bankruptcy Code provision authorizing a trustee to settle controversies...."). One of the rules of bankruptcy

---

4. The subordination is effected by allowing creditors other than WTG and the Lenders a security interest in a $6.7 million fund. TS ¶ 5(f).

procedure, Fed.R.Bankr.P. 9019(a), provides a procedure for motions to settle, but it cannot create a substantive requirement for court approval that does not exist in the Code itself.[5] Thus, unless the Bankruptcy Code requires court approval for the underlying action that the trustee seeks to accomplish, there should be no need for court approval of a settlement that effectuates that action.[6]

■ The settlement presented by the pending motion is subject to court review, since the trustee is seeking to liquidate assets of the estate—certain avoidance claims—and notice and a hearing is required, under Section 363(b) of the Code, for any use or sale of estate assets out of the ordinary course.[7] However, two aspects of procedure under Section 363(b) again reflect the overall policy of the Code regarding judicial involvement. First, the "notice and a hearing" requirement of Section 363(b) mandates court review of a proposed disposition of estate assets only where there is an objection. Where there is no objection after notice, a proposed disposition of assets may be effective without judicial review. *In re Winston Inn & Restaurant Corp.*, 104 B.R. 589, 595 (Bankr.E.D.N.Y.1989); *In re Snyder*, 74 B.R. 872, 877 (Bankr.E.D.Pa.1987).[8] Second, al-

though the proponent of the sale bears the ultimate burden of persuasion when there is an objection, the objecting party "is required to produce some evidence respecting its objections." *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir.1983).

■ Where an objection is made, the standard to be applied by the court in approving a disposition of assets is variously stated, but the general thrust is that the proposed sale should be in the best interest of the estate. *See In re Schipper*, 933 F.2d 513, 515 (7th Cir.1991) (sale under Section 363 involves exercise of fiduciary duty and requires an "articulated business justification"); *Lionel Corp.*, 722 F.2d at 1071 (judge passing on a contested motion to sell should "act to further the diverse interests of the debtor, creditors and equity holders, alike"); *In re Apex Oil Co.*, 92 B.R. 847, 866 (Bankr.E.D.Mo. 1988) ("Section 363(b)(1) mandates that the best interest of the estate be met by requiring any sale not in the ordinary course of business be: (1) for a fair and reasonable price, and (2) in good faith."); *In re Planned Systems, Inc.*, 82 B.R. 919, 923 n. 2 (Bankr. S.D.Ohio 1988) ("The proper standard for determining in the first instance if a proposed sale should be ordered is whether such sale is in the best interest of the estate.").[9]

5. Title 28 U.S.C. § 2075, which accords the power to adopt bankruptcy rules, specifies that they shall not "abridge, enlarge, or modify any substantive right." *See In re Phillips*, 966 F.2d 926, 933 (5th Cir.1992) (bankruptcy rules may not change authority to file bankruptcy on behalf of partnerships); *In re Allegheny International, Inc.*, 107 B.R. 518, 524 (W.D.Pa.1989) (bankruptcy rules may not limit right to intervene granted by Section 1109(b) of the Code).

6. For example, court approval is ordinarily not required in the process of allowing a claim against the estate. Claims filed pursuant to Section 501 of the Code are automatically allowed, pursuant to Section 502(a) unless an objection is filed under Section 502(b). *In re Abijoe Realty Corp.*, 943 F.2d 121, 125 n. 5 (1st Cir.1991). Thus, if a dispute between a creditor and trustee is settled by the filing of a claim in an agreed amount, no bankruptcy court approval would be necessary unless some other party filed an objection to the claim.

7. The settlement of a cause of action held by the estate is plainly the equivalent of a sale of that claim. There is no difference in the effect on the

estate between the sale of a claim (by way of assignment) to a third party and a settlement of the claim with the adverse party.

8. Section 102(1)(B)(i) of the Code makes it clear that the phrase "after notice and a hearing," as used in Section 363(b), "authorizes an act without an actual hearing if such notice is given properly and if such a hearing is not requested timely by a party in interest." Thus, as the House Report points out, "[i]f an objection to the proposed action is not made, then the trustee may proceed with the same authority as if he had obtained a court order authorizing the action." H.R.Rep. No. 595, 95th Cong., 1st Sess. 108 (1977). However, even though court review is not required, neither is it prohibited: a bankruptcy judge may choose to review the propriety of any disposition of assets under Section 363(b), even in the absence of objection. *In re VIII South Michigan Associates*, 167 B.R. 877, 879 (N.D.Ill.1994).

9. The major issue in dispute in the cases applying Section 363(b) is whether, in the context of a reorganization, a sale of substantial assets of the estate may short-circuit the plan confirmation

As it happens, two decisions of the Seventh Circuit Court of Appeals that discuss the appropriate standards for approving settlements have employed the same "best interest of the estate" test that emerges under Section 363(b). *In re Energy Co-op., Inc.*, 886 F.2d 921, 927 (7th Cir.1989) ("The benchmark for determining the propriety of a bankruptcy settlement is whether the settlement is in the best interests of the estate."); *In re American Reserve Corp.*, 841 F.2d 159, 161 (7th Cir.1987) ("A bankruptcy judge may approve a settlement in a liquidation proceeding if the settlement is in the estate's best interests."). Thus, although these decisions do not refer to Section 363, they are consistent with its provisions, and provide the appropriate guidance for ruling on the present motion.

■ Together, the decisions set forth a two-step methodology for determining whether a proposed settlement of claims held by the estate is in the estate's best interest. The first step is "a comparison of the settlement's terms with the litigation's probable costs and probable benefits," *American Reserve*, 841 F.2d at 161. This step requires the court to estimate both the value of the proposed settlement and the likely outcome of litigating the claims proposed to be settled. However, a precise determination of likely outcomes is not required, since "an exact judicial determination of the values in issue would defeat the purpose of compromising the claim." *Energy Co-op.*, 886 F.2d at 929, quoting *In re Penn Central Transp. Co.*, 596 F.2d 1102, 1114 (3rd Cir.1979). The second step is a determination of "whether or not the terms of the proposed compromise fall within the reasonable range of litigation possibilities." *Energy Co-op.*, 886 F.2d at 929, quoting *In re New York, N.H. & H.R.*, 632 F.2d 955, 960 (2d Cir.), *cert. denied*, 449 U.S. 1062, 101 S.Ct. 786, 66 L.Ed.2d 605 (1980). This determination is weighted in favor of settlement, since "a challenged settlement fails this test only if it 'falls below the lowest point in the range of reasonableness.'" *Energy Co-op.*, 886 F.2d at 929, quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir.), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

## B. The likely litigation outcome.

■ It is not a simple task to determine what would happen if the Telesphere estates litigated the claims against WTG and the lenders that they now propose to settle. At issue are avoidance claims (for preferences and fraudulent transfers) arising from the NTS transaction.[10] The nature of these claims makes the impact of litigating them difficult to assess for three reasons.

The first complication is that the prospective defendants in the litigation—WTG and the Lenders—are unsecured creditors of the estate. To the extent that these claims against the estates are not disallowed or subordinated, the defendants would receive, as unsecured creditors, some portion of any judgment they were required to pay into the estates.

Second, preference judgments may serve to increase the defendants' claims against the estates. Avoidance of a preference results in a return of transferred property to the estate, but may also result in the defendant asserting a claim that otherwise would have been satisfied by the transferred property. *See* 11 U.S.C. § 502(h) (providing for allowance of claims arising from recovery of property in avoidance actions); *In re Allied Com-*

---

process. *See In re Engineering Products Co.*, 121 B.R. 246, 249 (E.D.Wis.1990) (collecting authorities). This issue does not arise in the present case because the assets of the estate are being liquidated.

10. Apparently in order to provide for a global settlement, the agreement between Telesphere and the settling parties includes a fairly broad covenant from Telesphere not to sue WTG and a fairly broad release of the Lenders. TS ¶¶ 6(g) & 6(k). However, the objecting party, Tamona, has not identified, presented any evidence, or made any argument about claims unrelated to the NTS transaction. Similarly, with one exception, Tamona has not presented any significant evidence or argument regarding causes of action that do arise from the NTS transaction other than avoidance claims. The one exception—a claim for equitable subordination under Section 510(c) of the Bankruptcy Code—is discussed at pp. 560–62, below. Otherwise, the discussion of potential litigation outcomes is limited to avoidance claims arising from the NTS transaction. *See Lionel*, 722 F.2d at 1071 (objecting party has the burden of producing evidence).

*panies,* 155 B.R. 739, 744 (Bankr.S.D.Ind. 1992) ("[A]lthough a creditor did not have a claim at the time of bankruptcy because its claim had been satisfied by a preferential payment, subsequent avoidance of the payment relates back to the time before bankruptcy, so the claim is deemed to have been unpaid at the time the petition was filed.").[11]

Finally, the extent to which Telesphere can recover on its avoidance claims is limited by Section 550(c) of the Code, which allows only a single satisfaction for any avoided transfer. See *In re Bennett,* 133 B.R. 374, 381 (Bankr. N.D.Tex.1991) (explaining Section 550(c) and holding that a trustee may recover the amount of an avoided transfer from either an individual debtor or from the transferee, but not from both). Thus, collection of a judgment on claims against WTG and the Lenders may reduce claims that Telesphere would be able to assert against other defendants.

Therefore, in assessing the likely outcome of litigating the claims involved in the pending settlement, it is necessary not only to consider (1) the likelihood of Telesphere obtaining a particular recovery, and (2) the litigation costs it would incur, but also (3) the portion of any recovery that would be returned to the defendants as payment of their unsecured claims and (4) the impact of the recovery on the estates' right to pursue other defendants.[12]

*1. The likely recovery by Telesphere.* The possible recoveries for avoidance actions are set forth in Section 550 of the Bankruptcy Code. Although, as noted below, the causes of action overlap, it is useful to consider separately the recoveries that Telesphere would likely obtain if it litigated its claims against WTG and the Lenders.

*Claims against WTG.* From the scant evidence presented at the hearing with respect to WTG, it appears likely that Telesphere would prevail against WTG on a preference claim under Section 547(b) of the Bankruptcy Code. In such a claim, Telesphere would assert that the $26.8 million payment that Telesphere made to WTG from the NTS loan proceeds (1) was for the benefit of an insider/creditor who had guaranteed the loan, (2) was on account of an antecedent debt (the WTG loan), (3) was made while Telesphere was insolvent, (4) was made within one year of the filing of the petition; and (5) enabled the creditor/insider to receive more (by way of release from his guaranty) than if the payment had not been made and he had received a distribution in a Chapter 7 case. The legal validity of this analysis was established in this Circuit by *Levit v. Ingersoll Rand Financial Corp. (In re V.N. Deprizio Construction Co.),* 874 F.2d 1186 (7th Cir.1989).[13] The facts relating to the claim against WTG were not well developed during the hearing on the reasonableness of the settlement, because no one objected to the

11. The Lenders have argued that fraudulent conveyance recoveries would have a similar effect: that to the extent a lender is required to give up fraudulently conveyed collateral, its secured claim would be reduced, but its unsecured claim would increase. This argument is not persuasive. The relevant fraudulent conveyance provisions—Section 548(a) of the Bankruptcy Code; Sections 5(a)(1) and 8(a)(1) of the Uniform Fraudulent Transfer Act, 740 ILCS 160/5(a) and 8(a)(1) (1992), and Sections 4, 9–10 of the Uniform Fraudulent Conveyance Act, N.Y. Debtor & Creditor Law §§ 273, 278–79 (McKinney 1994)—provide not only for the avoidance of fraudulent transfers of property, but also for the avoidance of "obligations" that are deemed fraudulently incurred. Thus, for example, if insolvent debtors incur an obligation without fair consideration, the obligation itself, as well as the transfer of any collateral, would be avoided. *See Covey v. Commercial National Bank of Peoria,* 960 F.2d 657, 661 (7th Cir.1992) (upholding the avoidance of an "obligation" under Section 548(a) even though it did not involve a transfer). This is the plain import of the statutory language, and there appears to be no authority holding to the contrary.

12. One factor that the court is not required to include in its assessment is the risk of noncollection. Based on the evidence at trial, WTG and the Lenders possess sufficient assets to satisfy any judgment entered against them on account of Telesphere's avoidance claims.

13. Section 202 of the Bankruptcy Reform Act of 1994 eliminates the "DePrizio" cause of action, by prohibiting the recovery by a trustee from an initial transferee that is not an insider. Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, § 202, 108 Stat. 4106, 4121 (1994). This provision, however, like most of the Act, does not apply with respect to cases commenced before the date of enactment, October 22, 1994. *Id.,* § 702(b), 108 Stat. at 4150.

portion of the settlement involving WTG. However, it would appear that the only issue that might be seriously litigated would be the insolvency of Telesphere at the time of the NTS loan, and, as discussed below, it is likely that Telesphere could establish this insolvency. Thus, albeit with some risk, it appears likely that Telesphere could succeed in recovering $26.8 million on a preference claim against WTG. However, as noted above, WTG's unsecured claims would increase by the amount of the recovered preference. *Allied Companies,* 155 B.R. at 744.

Telesphere also has a potential avoidance action against WTG based on a fraudulent conveyance theory. Section 544(b) of the Code provides that a trustee (and hence a debtor in possession under Section 1107(a)) "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim." Thus, Section 544(b) allows a debtor in possession to pursue a fraudulent conveyance action under applicable state law. *In re Xonics Photochemical, Inc.,* 841 F.2d 198, 202 (7th Cir.1988).[14] If Telesphere were successful in such an action, it would be able both to recover the payment made to WTG and avoid the obligation to pay WTG on the WTG loan. See n. 11, above. Telesphere's argument would be that WTG knew its loan proceeds would be used to pay Ronald Haan, that this payment provided less value to

Telesphere than the amount of its indebtedness to WTG, and that the transaction left Telesphere insolvent. However, the prosecution of an such an action would be both legally and factually complex, and the relevant issues were not addressed at the hearing. It is not possible, therefore, to assess the likelihood of Telesphere prevailing against WTG in a fraudulent conveyance action.

*Claims against the Lenders.* Telesphere's avoidance action against the Lenders would be grounded solely on a fraudulent conveyance theory, as defined by Section 548 of the Bankruptcy Code.[15] As noted above, (n. 11) Section 548(a) grants a right to avoid both fraudulent transfers and fraudulent obligations.[16]

*The initial claim.* Transfers are fraudulent under section 548(a) if: (1) they were made by the debtor with an actual intent to defraud creditors ("actual fraud claims"); or (2) they are presumed to be fraudulent as a matter of law ("constructive fraud claims"). 11 U.S.C. § 548(a)(1) and (2); *see Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 504–05 (N.D.Ill.1988); *In re Aluminum Mills Corp.,* 132 B.R. 869, 885–88 (Bankr. N.D.Ill.1991). Both grounds for fraudulent conveyance might be asserted by Telesphere, and the constructive fraud claim may be likely to prevail.

**14.** Telesphere would probably not be able to employ the direct fraudulent conveyance provisions of Section 548(a) of the Code because that section is only applicable to transfers made and obligations incurred "within one year before the filing of the petition." The May 1990 WTG loan took place more than one year before the filing of the petitions in these cases.

**15.** The parties have mentioned the possibility of fraudulent transfer claims under Section 544(b) of the Code, as discussed above in connection with claims against WTG. However, they have not identified any respect in which Telesphere's recovery under Section 544(b) would be greater than its recovery under Section 548. Accordingly, only Section 548 is considered here.

**16.** Section 548(a) provides in pertinent part that a trustee (and hence a debtor in possession): may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of

the petition, if the debtor voluntarily ...
> (1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
> (2)(A) received less than reasonably equivalent value in exchange for such transfer or obligation; and (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a).

■ It is possible for actual fraud claims to arise in leveraged buyout transactions. *See, e.g., Wieboldt Stores,* 94 B.R. at 504; *Aluminum Mills Corp.,* 132 B.R. at 885–88. However, to prevail on such a claim, Telesphere would have to show that it incurred obligations or transferred security interests to the Lenders with an actual intent to hinder, delay, and defraud its creditors. *Wieboldt Stores,* 94 B.R. at 504; *Aluminum Mills Corp.,* 132 B.R. at 885. One theory occasionally offered in support of such a claim is that a debtor engaged in an "equity sweep," encumbering its assets to obtain loan proceeds to distribute to its equity security holders, notwithstanding its actual knowledge of, or recklessness about, the fact it would have unreasonably small capital at the conclusion of the loan transaction. *See, e.g., Wieboldt Stores,* 94 B.R. at 504; *Aluminum Mills Corp.,* 132 B.R. at 885–88. Such a theory has not been shown to have any significant evidentiary support in the present case. To the contrary, the NTS acquisition was not a cash out of Telesphere shareholders, but the acquisition of another business.[17] Furthermore, the testimony indicates that Telesphere (as debtor in possession) and the Committee found no significant evidence of any actual intent on the part of Telesphere's management to defraud the firm's unsecured creditors. *See generally* Geller Trans. 67–69;

Fishman Trans. at 208–10. Thus, there is little likelihood that Telesphere would succeed on an actual fraud claim.

■ Constructive fraud claims can also arise in the context of leveraged buyouts. *See, e.g., Wieboldt Stores,* 94 B.R. at 504–05; *Aluminum Mills Corp.,* 132 B.R. at 888 n. 18. To prevail on such a claim against the Lenders, Telesphere would have to show that in connection with the NTS financing (1) it received less than reasonably equivalent value for the obligations it assumed and the security interests it transferred, and (2) that (a) it was insolvent or became insolvent as a result of the transaction, (b) it retained unreasonably small capital after the transaction, or (c) it entered into the transaction with the intent to incur debt beyond its ability to pay. *Wieboldt Stores,* 94 B.R. at 504–05; *Aluminum Mills Corp.,* 132 B.R. at 888 n. 18. No interested party has seriously disputed either Telesphere's failure to receive reasonably equivalent value in the NTS transaction or Telesphere's insolvency and unreasonably small working capital following the NTS transaction. As to both issues, it appears that Telesphere would likely prevail in litigation, and so establish the elements of a constructive fraudulent transfer claim against the Lenders, allowing avoidance of transaction.[18]

17. As noted earlier, Telesphere's controlling shareholder gave a $26 million personal guaranty to support the WTG loan. The removal of this personal liability could be seen as a kind of "cash out," since the shareholder's liability on the WTG loan was eliminated by the transaction with the Lenders, which the shareholder did not guarantee. On the other hand, the provision of the personal guarantee tends to indicate that management genuinely believed that the acquisition of NTS was in Telesphere's best interest, at least at the time of the WTG loan.

18. To determine reasonably equivalent value, a court would be required to weigh the obligations assumed by Telesphere and the security interests it transferred against the benefit that Telesphere received as a result of the NTS transaction. *See, e.g., In re Bundles,* 856 F.2d 815, 824 (7th Cir. 1988); *In re Grabill Corp.,* 121 B.R. 983, 994 (Bankr.N.D.Ill.1990). The Lenders might argue that equivalent value was given because Telesphere received cash from the Lenders in the amount of the obligations it assumed. This argument would probably fail. Because the Lenders

had full knowledge of the purpose of the loans they were making, the transaction would likely be collapsed, leaving the court to count as value to Telesphere only what Telesphere received at the end of the transaction. *Wieboldt Stores,* 94 B.R. at 502 (in determining whether to collapse a leveraged transaction, "a court should focus not on the formal structure of the transaction but rather on the knowledge or intent of the parties involved"). In the NTS transaction, viewed as a whole, Telesphere incurred an obligation (and transferred security interests) in the amount of $94 million, in exchange for (1) the stock of NTS, unencumbered by Ronald Haan's asserted loan to NTS, (2) the payoff of its prior secured loans, and (3) $1.3 million in working capital. Part of the loan proceeds, $6 million, was paid in professional fees. See pp. 547–48, above. Given the prompt and total failure of the NTS transaction, it is likely that the NTS stock and the Haan payment would be found not to have been worth the money paid. Even more clearly, the professional fees were of dubious value to Telesphere. *See Grabill,* 121 B.R. at 994–95 ("As a general rule, a debtor receives inadequate consideration

*The good faith defense.* This conclusion, however, merely sets the scene for the major controversy between the parties—the extent to which the Lenders qualify as good faith transferees under Section 548(c). Section 548(c) grants to a good faith transferee a lien on, or a right to retain an interest in, transferred property (and to enforce a challenged obligation) to the extent that the transferee gave value to the debtor in exchange for the transfer or obligation.[19] Thus, if the Lenders were good faith transferees, they would retain their secured claims to whatever extent Telesphere did receive value from the NTS transaction. The controversy arises from the parties' different views about (1) the meaning of good faith in section 548(c); (2) the existence of good faith, however defined, in the NTS transaction; and (3) the extent of the value provided by the Lenders. Tamona basically maintains that the Lenders lacked good faith since the Lenders were negligent in making a loan for an acquisition that would likely fail to provide value to Telesphere. Telesphere, on the other hand, contends that the Lenders acted in good faith since the Lenders did not have actual knowledge of, and were not reckless about, the voidability of the transfers in the NTS transaction.

Section 548(c) does not define "good faith," and there is no clear source of interpretative guidance.[20] Courts applying Section 548(c) have therefore avoided definitions of good faith. *See, e.g., In re Agricultural Research and Technology Group, Inc.,* 916 F.2d 528, 536 (9th Cir.1990) ("Courts have been candid

in acknowledging that good faith 'is not susceptible of precise definition.' "); *In re Roco Corp.,* 701 F.2d 978, 984 (1st Cir.1983) (Good faith is "not susceptible of precise definition.") Moreover, the courts have varied widely in the general approach they have taken in deciding questions of good faith in the context of fraudulent conveyance law. *See* 4 *Collier on Bankruptcy,* ¶ 548.07[2], at 548–71 (Lawrence P. King et al. eds., 15th ed. 1993) ("Good faith has been described in various ways.") and the decisions cited therein; 4 *Collier on Bankruptcy,* ¶ 67.41, at 589 (James M. Moore *et al.* eds., 14th ed. 1978). These decisions reflect a tension between a policy of protecting creditors from fraudulent transfers and a policy of promoting the ease and security of commercial transactions, with the outcome influenced substantially by the equities of the particular fact situations before the courts.

Thus, in assessing the likelihood that the Lenders could successfully assert good faith under Section 548(c), it is important to consider the factual context of this case. As noted above, Telesphere itself is not likely to be found to have acted in bad faith in borrowing funds from the Lenders, but rather to have had a good faith intention of making a successful acquisition of NTS. If Telesphere was acting in good faith in seeking funding for the acquisition, could the Lenders have been acting in bad faith in supplying it? Tamona points only to the precarious financial condition of both Telesphere and NTS in arguing for a bad faith finding. However,

when he transfers property for consideration which passes to a third party.") Thus, a lack of reasonably equivalent value is a likely finding.

Telesphere would also be likely to establish insolvency or inadequate capital as a result of the transaction. Balance sheet solvency would only have existed after the NTS transaction if NTS were accorded a value well in excess of its tangible assets. Geller Trans. at 53. And the NTS acquisition left Telesphere with only $1.3 million in working capital to use in assimilating a major telephone network. Subsequent events tend to show that this was not adequate. Within three months of the acquisition, Telesphere had depleted its working capital, and had to borrow an additional $10.7 million for its working capital needs.

**19.** Section 548(c) states in pertinent part:

Except to the extent that a transfer or obligation voidable under [section 548(a)] is voidable under section 544, 545, or 547 of [the Code], a transferee or obligee of such transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

**20.** Beyond the language of Section 548(c) itself, there is no definition of "good faith" anywhere in the Bankruptcy Code. Likewise, the legislative history related to section 548(c) never defines, and scarcely addresses, good faith. *See* S Rep. No. 989, 95th Cong., 2d Sess. 89–90 (1978); HR Rep. No. 595, 95th Cong., 1st Sess. 375 (1977).

several decisions of the Seventh Circuit indicate that this argument is unlikely to prevail.

The governing rule was announced by the court within a few years after the 1898 Bankruptcy Act went into effect. *In re Soudan Mfg. Co.*, 113 F. 804 (7th Cir.1902), focused on good faith under Section 67d of the Bankruptcy Act.[21] In that case, the debtor *was* acting in bad faith: it sought funds in order to continue a business which had engaged in check-kiting, and intended to use the borrowed money, at least in part, to pay an insider. 113 F. at 805–07. The lender made the loan, secured by the debtor's plant and equipment, solely on the basis of a valuation of the collateral, without investigating the books of the business. 113 F. at 805, 807–08. Shortly after the consummation of the loan, an involuntary bankruptcy proceeding was commenced against the debtor. In those proceedings, the lender's chattel mortgage was attacked for being a fraudulent transfer in violation of section 67e of the Bankruptcy Act, 30 Stat. 564, ch. 541 (1901). 113 F. at 806. The actual fraud claim succeeded at trial and resulted in the district court entering a judgment avoiding the lender's mortgage lien. 113 F. at 805. In reversing this judgment, the Seventh Circuit held that the lender had acted in good faith under section 67d, despite the precarious financial condition of the debtor, because the lender made the advances in an honest effort to assist the debtor in carrying out its business. 113 F. at 809. The court found applicable the following doctrine from an earlier Supreme Court decision:

> There is nothing in the bankrupt law which interdicts the lending of money to [an insolvent], if the purpose be honest, and the object not fraudulent. And it makes no difference that the lender had good reason to believe the borrower to be insolvent, if the loan was made in good faith, and without any intention to defeat the provisions of the bankrupt act. It is not difficult to see that in a season of pressure the power to raise money may be of immense value to a man in embarrassed circumstances. With it he might be saved from bankruptcy, and without it financial ruin would be inevitable. If the struggle to continue his business be an honest one, and not for the fraudulent purpose of diminishing his assets, it is not only not forbidden, but is commendable.

113 F. at 809, quoting *Tiffany v. Boatman's Institution*, 85 U.S. (18 Wall.) 375, 388, 21 L.Ed. 868 (1873).

More than forty years after *Soudan*, the Seventh Circuit returned to the issue of good faith in *In re Peoria Braumeister Co.*, 138 F.2d 520 (7th Cir.1943). *Peoria Braumeister* dealt with a statutory provision, Section 67d(6) of the Bankruptcy Act, 11 U.S.C. § 107(d)(6) (1940), quite similar to Section 548(c).[22] In *Peoria Braumeister*, a lender advanced $2500 to the debtor in the ordinary course of its business, and took in exchange a promissory note, secured by a chattel mortgage, in the amount of $3000. 138 F.2d at 521. The debtor made some payments on the note, but thereafter filed a voluntary bankruptcy proceeding. 138 F.2d at 521–22. The bankruptcy trustee sought to avoid the chattel mortgage as a fraudulent transfer. 138 F.2d at 522–23. Because the debtor was insolvent at the time of the loan, and because it executed the note for less than fair consideration (a $3000 note for $2500 in loan proceeds), the bankruptcy referee found the transaction entirely void. 138 F.2d at 523. The Seventh Circuit reversed, holding that the lender was entitled to a secured claim in the amount of the consideration it actually provided, less the repayment. *Peoria Braumeister*, 138 F.2d at 523–24. In reaching this outcome, the court held that "[a]ctual fraudulent intent requires a conscious realization by the lienor that taking the lien will work a fraud on the debtor's creditors" and that "a grantee in a fraudulent conveyance

---

21. The Bankruptcy Act of 1898, § 67d, 30 Stat. 564, ch. 541 (1901), provided in pertinent part that "liens given or accepted in good faith and not in contemplation of, or in fraud upon, this act, and for a present consideration ... shall not be affected by this act."

22. Section 67d(6) provided, in relevant part, that a "purchaser, lienor, or obligee, who without actual fraudulent intent has given a consideration less than fair ... for [an interest or obligation of an insolvent debtor] may retain the property, lien, or obligation as security for repayment."

who is not guilty of actual fraud but is chargeable with knowledge of such facts that the law holds him guilty of constructive fraud is entitled to protection to the extent of the consideration which he paid if the obligation is set aside." 138 F.2d at 524.

Finally in *Covey v. Commercial National Bank of Peoria*, 960 F.2d 657, 662 (7th Cir. 1992), the court upheld a finding of good faith under Section 548(c) in a situation where a lender made loans to a group of corporations that plainly were in financial difficulty, with the bankruptcy judge finding a 60% likelihood that the corporations would be unable to repay the loans. Nevertheless, because the judge also found that the loans were made "in the expectation that [the corporations] could be restored to profitable operation," the determination of good faith was accepted. Plainly, then, the rule of *Soudan* and *Peoria Braumeister* remains good law in the Seventh Circuit: even actual knowledge of the risk involved in a proposed loan does not taint the lender's action with bad faith, as long as the lender genuinely intends the transaction to succeed.[23]

Under this standard, the Lenders are quite likely to be found to have acted in good faith in making their loans to Telesphere. There is no evidence whatever that the Lenders were engaged in any effort to defraud creditors, and, in contrast to *Soudan*, there is no evidence that the borrower was engaged in any such effort. Moreover, the Lenders made their loans in the ordinary course of their business, after performing an extensive due diligence investigation into numerous aspects of the NTS transaction, including the financial condition of Telesphere and the value to be received by Telesphere as a result of the NTS transaction. That investigation generated several opinion letters from legal counsel and at least three reports from independent consulting firms.

Though those letters and reports identified legal and economic risks with the NTS transaction, they also disclosed a reasonable prospect of success of the NTS transaction and the eventual repayment of the Lenders' loan. The Lenders apparently relied on these opinion letters and reports in extending the Lenders' loan. Their reliance on such documents may have been negligent, but it hardly negates the substantial likelihood that the Lenders made their loans in a good faith expectation of being repaid from a successful transaction.

*Resulting recovery.* Given a likely finding of good faith under Section 548(c), it is necessary to estimate the value received by Telesphere in the NTS transaction. To the extent such value was given, the Lenders will be able to retain their liens and rights to enforce Telesphere's obligations. The parties are in some dispute regarding the extent of this value, but even after collapsing the transaction, the NTS loan proceeds plainly benefitted Telesphere at least to the extent that Telesphere's pre-existing secured working capital facilities were retired (approximately $37.3 million) and a commercial lease was paid ($1.6 million). There may be additional value. Although, as noted earlier, the extent of payments for the loan processing may be questioned, some fees would likely be approved as fair value. Most significantly, it is likely that some value would be attributed to the NTS stock acquired. Thus, of the $92.7 million obligation incurred by Telesphere to the Lenders, a minimum of $38.9 million would remain an enforceable obligation, to which the Lenders would retain their liens, and Telesphere's likely judgment against the Lenders under Section 548 would not exceed $53.8 million.

*Section 550(c) limitation.* The preceding analysis suggests that Telesphere has a prob-

**23.** Tamona relies on the Seventh Circuit opinion in *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir.1988), for the proposition that a transferee acts in good faith only to the extent that it does not know of facts that would put a reasonable person on inquiry notice about the precarious financial condition of the transferor or, alternatively, the voidability of the transfer. *Bonded Financial*, however, interpreted "good faith" only in the context of Section 550(b) of the Bankruptcy Code, and recognized that this section addresses different concerns than those of Section 548(c). 838 F.2d at 897. The holding of *Bonded Financial*, that a subsequent transferee has no duty to commence its own investigation into the voidability of the initial transfer in the absence of inquiry notice that the initial transfer may be voidable, has no application to Section 548(c).

ability of obtaining judgments in the amount of $26.8 million against WTG and as much as $53.8 million against the Lenders. However, this does not translate into a probability of Telesphere collecting an aggregate amount of $80.6 million. As noted above, Section 550(c) of the Bankruptcy Code limits trustees (and, under Section 1107(a) of the Bankruptcy Code, debtors in possession) to "a single satisfaction" in connection with avoidances under Sections 547 or 548. Yet a $26.8 million recovery against WTG would involve the payment of funds included in the NTS loan. Telesphere could only recover this $26.8 million once, and hence the maximum total avoidance for Telesphere in connection with the NTS transaction is likely to be $53.8 million. Moreover, this $53.8 million maximum judgment is not a cash recovery. WTG actually received $26.8 million from Telesphere, and that sum would be recoverable under Section 550(a); the remaining $27 million of the judgment would be asserted against the Lenders. The Lenders, however, hold an unsecured deficiency claim against Telesphere in the amount of about $38 million (see n. 27, below). Hence, the effect of a judgment would likely be simply to reduce the Lenders' unsecured claim from $38 million to $11 million.[24]

*2. Litigation costs.* The anticipated judgment against WTG and the Lenders would be obtained only after substantial litigation. The analysis set forth above gives some indication of the difficult factual and legal issues that the cases would involve. Prolonged factual hearings and extensive briefing would be required to bring the recovery about. No one has contested the fact that Telesphere will incur significant costs and delay in adjudicating fraudulent transfer claims against WTG and the Lenders. *See* Geller Trans. 107–08. The parties, however, have not provided an estimate of the costs of pursuing such litigation. Such an estimation is difficult to make, in large part because Telesphere has not yet retained counsel to pursue the litigation. If the litigation were pursued under a contingency fee agreement,

Telesphere's costs could reasonably be expected to exceed $10 million [ ($54 million recovery) × (20% contingency fee rate) ]. And even if the litigation were pursued by counsel retained under an hourly fee agreement, Telesphere's litigation costs would probably exceed $1 million in light of the complex issues arising from the NTS transaction; the amount of the claims; and the tenacity, sophistication, and financial resources of WTG and the Lenders. *See Geller Trans.* 107–08. In order to value the settlement conservatively, the court will use $800,000 as an estimate of Telesphere's litigation costs, reducing the likely monetary recovery to no more than $26 million.

*3. Payout to defendants.* The next element involved in measuring the benefit to Telesphere of litigation against WTG and the Lenders is the extent to which the likely recovery would be diluted by payments to WTG and the Lenders in their capacity as unsecured creditors. To see the problem here, assume that, after satisfaction of any judgment obtained by Telesphere, WTG and the Lenders together held 90% of the allowed unsecured claims, and that all of the funds recovered by Telesphere were available to pay unsecured creditors. The result would be that WTG and the Lenders would take back, as unsecured creditors, $23.4 million of the $26 million monetary recovery, with the other creditors taking only $2.6 million. Since the proposed settlement proposes to subordinate claims of WTG and the lenders to those of the other creditors, it is important to determine what portion of the anticipated litigation recovery would be paid to these other creditors. In other words, the benefit of litigation to the "Telesphere" estates, under the facts of this case, is the net increase in assets available to creditors of the estates other than WTG and the Lenders (the "non-settling creditors").

■ *Priority of claims.* Tamona, in objecting to the proposed settlements, has argued that the full amount of any litigation recovery would redound to the benefit of the non-settling creditors, because the claims of WTG and the Lenders should be equitably subordinated under Section 510(c) of the

24. Since the Lenders would be allowed to retain their liens and enforce their obligations to the extent that they gave value in good faith (pursuant to Section 548(c)), and to the extent that the liens and obligations are not avoided (because of recovery against WTG, pursuant to Section 550(c)), the Lenders would be allowed to retain all of their secured claims.

Bankruptcy Code. Section 510(c)(1) permits all or part of an allowed claim to be subordinated, for purposes of distribution, to all or part of another allowed claim, in accordance with "principles of equitable subordination." The Bankruptcy Code does not define these principles. *In re Virtual Network Services Corp.*, 902 F.2d 1246, 1247 (7th Cir.1990); *In re Burden*, 917 F.2d 115, 117 (3d Cir.1990). However, the legislative history of Section 510(c) suggests that Congress intended the principles to be developed by the courts, *see generally Virtual Network*, 902 F.2d at 1247–50; *Burden*, 917 F.2d at 118–19; *Schultz Broadway Inn v. United States*, 912 F.2d 230, 232 (8th Cir.1990), and the Seventh Circuit has in fact issued a series of opinions developing and applying principles of equitable subordination. *See In re EDC, Inc.*, 930 F.2d 1275, 1281–82 (7th Cir.1991); *In re Vitreous Steel Products Co.*, 911 F.2d 1223, 1237 (7th Cir.1990); *In re Kham & Nate's Shoes No. 2, Inc.*, 908 F.2d 1351, 1356–59 (7th Cir.1990); *In re Virtual Network Services Corp.*, 902 F.2d 1246, 1247–50 (7th Cir. 1990); *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1350–51 (7th Cir.1987), *cert. denied*, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988). Based on these decisions, it appears that grounds for equitable subordination can exist in only two sets of circumstances. The first, and most typical situation, is one in which a particular claimant has been guilty of inequitable conduct in connection with a claim. As explained in *Kham & Nate's Shoes*, this sort of equitable subordination is most frequently encountered where corporate insiders "convert their equity interests into secured debt in anticipation of bankruptcy." 908 F.2d at 1356. The second situation is where the claim itself is of a nature proper for subordination, as illustrated in *Virtual Network*. There, the debtor in a liquidating Chapter 11 case sought equitable subordination of penalties accruing on tax claims. The court noted that such penalties are automatically subordinated in Chapter 7 cases, pursuant to Section 726(a)(4) of the Code, but that this provision is inapplicable to Chapter 11 cases. 902 F.2d

at 1249. In affirming the district court's decision to subordinate the tax penalties to other unsecured claims, the Court of Appeals noted the punitive nature of the tax penalties, and the fact that the business to be punished was no longer in operation. 902 F.2d at 1250. These aspects of the tax penalty claims made equitable subordination appropriate even without "inequitable conduct on the part of the creditor." *Id.*

Telesphere is very unlikely to prevail on a claim of equitable subordination against either WTG or the Lenders on either of the two grounds for equitable subordination. First, there has been no indication that either WTG or the Lenders engaged in inequitable conduct. *Kham & Nate's Shoes*, 908 F.2d at 1357 (" 'Inequitable conduct' in commercial life means breach plus some advantage-taking. . . ."). They were not insiders.[25] They did not breach their contractual obligations to provide funds to Telesphere. Nor did they engage in opportunistic or strategic behavior in order to obtain a better deal from Telesphere. It appears from the evidence presented at the hearing that WTG extended its loan to assist in the interim financing of the NTS transaction and was repaid on that loan upon the closing of the NTS transaction. The Lenders extended their loan to assist Telesphere with the financing of the NTS transaction and thereafter provided, at Telesphere's request, additional funds to aid Telesphere in alleviating its working capital shortages. In return, the Lenders received payments from Telesphere on account of their loans. The payments by Telesphere were apparently made in accordance with the respective loan agreements. In sum, Telesphere entered into contractual arrangements with creditors who pursued their own interests through the negotiation for and the eventual enforcement of their respective contractual rights. Such conduct cannot be seen as inequitable. *See EDC*, 930 F.2d at 1281–82 ("The doctrine of equitable subordination may not be used to impose obligations on parties above what they have agreed to, in the absence of evidence of overreaching."); *Kham & Nate's Shoes*, 908 F.2d at 1357–59.

Similarly, there is nothing in the nature of the financing of a leveraged buyout that cre-

---

**25.** The case law discussing equitable subordination based on the conduct of the claimant distinguishes sharply between claimants who exercised control over the debtor (insiders) and persons who did not exercise such control. *See, e.g., Kham & Nate's Shoes*, 908 F.2d at 1356–57. None of the parties presented evidence that WTG or the Lenders exercised control over Telesphere.

ates any grounds for subordination without inequitable conduct. Unlike the situation in *Virtual Network,* the claims asserted by WTG and the Lenders are for actual consideration, not penalties. Subordination of loans such as these, in favor of other creditors, would fly in the face of the principle that bankruptcy enforces, rather than creates, creditors' entitlements. *See EDC,* 930 F.2d at 1282.[26]

*Amount of claims.* Because the unsecured claims of WTG and the Lenders are thus unlikely to be subordinated, it is necessary to determine what portion of the claims they constitute, in order to determine how large a proportion of the estimated litigation recovery would be paid with respect to these claims. Telesphere and Tamona did not develop a complete evidentiary record concerning the allowed amount of unsecured claims against Telesphere. However, as noted in the following table, it is possible from the available evidence to estimate the probable amount and priority of the allowed claims against Telesphere:

| Creditor | Estimated Amount of Allowed Administrative and Priority Claims | Estimated Amount of General Unsecured Claims |
|---|---|---|
| 1. Lenders | $–0– | $ 38,000,000 [27] |
| 2. WTG | $ 4,100,000 [28] | $190,000,000 [29] |
| 3. Non-settling creditors | $ 6,500,000 [30] | $ 65,000,000 [31] |
| Total | $10,600,00 | $293,000,000 |

**26.** In arguing in favor of subordination, Tamona relies principally on *In re O'Day Corp.,* 126 B.R. 370, 411–12 (Bankr.D.Mass.1991). In this case, the court found that security interests provided by the debtor to a leveraged buyout lender were fraudulent conveyances, and then had to address the question of whether the lender retained an unsecured claim with respect to the loan. That issue has been addressed earlier in this opinion: to the extent that a secured loan is avoided as a fraudulent conveyance, the underlying obligation as well as the security interest is avoided. See n. 1, above. Rather than address this question, the *O'Day* court employed equitable subordination to prevent payment on the underlying obligation. Thus, the court only subordinated unsecured claims that were, in this court's opinion, already subject to avoidance. Even if its application of equitable subordination principles were consistent with those applied by the Seventh Circuit, *O'Day* cannot be seen as authority for the equitable subordination of unsecured claims that are excepted from avoidance under Section 548(c).

**27.** The general unsecured claim of the Lenders is a deficiency claim arising from their loan. Telesphere maintains that the deficiency is either $40 million or $42 million. *See, e.g.,* Geller Trans. 51–52 & 111–12; Counsel Trans. at 4. The Lenders contend that their deficiency claim approaches $52 million. *See* Geller Trans. 111–12; Counsel Trans. at 3–4. Both appear to be mistaken. First, the Lenders arrive at a $52 million deficiency by failing to include in their collateral a $12 million sales escrow to which they are probably entitled. *See, e.g.,* Geller Trans. 111–12; Counsel Trans. at 3–4. Second, another escrow, in the amount of $1.6 million, held for payment of taxes, would also likely be available to the Lenders in the absence of a settlement, even though the proposed settlement waives the Lenders' claims to this fund. *See* Geller Trans. at 102. This may be the source of the confusion between $40 and $42 million, and would indicate that, in the absence of a settlement, the Lenders' would have only a $40 million deficiency. Finally, all of the parties appeared to have failed to consider another fund, in excess of $2 million, arising from a 900–number escrow fund. Counsel Trans. at 5. This would also be available to the Lenders, reducing their unsecured claims to about $38 million.

**28.** There is no dispute regarding the amount of this claim. *See* Geller Trans. 95–96.

**29.** There is no material dispute that WTG's general unsecured claim approximates $190 million, *see* Geller Trans. 95–96, 99–100, 110–11. However, it should be noted that if a recovery against WTG were based solely on a preferential repayment of the WTG loan, WTG would be entitled to assert an additional unsecured claim in the amount of any judgment paid to Telesphere. See pp. 14–15, above. The $190 million claim amount is thus conservative.

**30.** Telesphere and Tamona did not contest that the amount of administrative claims of creditors, other than WTG and the Lenders, approaches $4.5 million. Nemmer Trans. at 115–17. They did not, however, provide any estimate of the administrative expenses to be allowed in the future. The court has estimated an additional $2 million in administrative expenses to cover the expected costs of completing the general case administration and of pursuing avoidance claims against parties other than WTG and the Lenders.

**31.** Telesphere and Tamona do not materially dispute that $65 million is the expected aggregate

*Funds in estate.* In the absence of litigation recoveries against WTG and the Lenders, it appears that the Telesphere estates would have approximately $10.5 million available to pay the claims outlined above. At the time of the settlement hearing, Telesphere had in its general funds slightly less than $4 million. *See* Nemmers Trans. at 115; Counsel Trans. at 5–6. In addition to this amount, Telesphere was probably entitled to another $1.565 million in an account held in an "excess postpetition escrow" with one of the Lenders. Geller Trans. at 102; Counsel Trans. at 5–6. Thus, the estate had approximately $5.5 million available at the time of the settlement hearing. The court estimates that Telesphere will receive recoveries of about $5 million in litigation not involving the NTS transaction, for a total estate sufficient to cover all of the expected administrative expenses, but not large enough to allow any substantial payment to general unsecured creditors.

*Benefit to non-settling creditors.* Under the facts and estimates set forth above, it is possible to compute the likely benefit to the non-settling creditors of the pursuit of litigation against WTG and the Lenders. First, Telesphere would likely recover, from WTG, $26 million in cash, net of costs, and the Lenders' unsecured claim would be reduced from $38 million to about $11 million. The $26 million in cash would then be distributed pro rata to satisfy unsecured claims totalling about $266 million ($11 million for the Lenders, $190 million for WTG, and $65 million for the non-settling creditors). WTG and the Lenders would be entitled to receive about 76% (201/266) of this estate, or about $19.6 million. The non-settling creditors would receive the remaining 24% of the estate (65/266) or about $6.4 million, somewhat less than a 10% distribution. This is the likely net benefit to the non-settling creditors of pursuing litigation only against WTG and the Lenders.

*4. Impact of Telesphere's right to pursue other defendants.* In addition to its claims against WTG and the Lenders in connection with the NTS transaction, Telesphere also has claims against the ultimate recipients of the funds, Francesco Galesi (for the WTG loan repayment) and Ronald Haan (for the purchase of NTS stock). To the extent that Telesphere obtained a recovery from WTG and the Lenders, it would forego its right to recover against Galesi and Haan, since Section 550(c) allows only a single recovery with respect to any avoided transfer.[32] It would therefore be in the best interest of Telesphere to pursue Haan (and the other NTS shareholders) rather than the Lenders for the recovery of the purchase price for the NTS stock ($21 million). Fraudulent conveyance claims against these individual defendants would result in an inflow of cash into the estate, rather than a mere reduction of the Lenders' unsecured claims. If the stock purchase with the NTS shareholders were

---

amount of general unsecured claims, excluding the general unsecured claims of WTG and the Lenders. *See, e.g.,* Counsel Trans. at 2–3. It is possible that recovery of preference claims could increase this amount somewhat, but any estimate of this increase would be purely speculative.

**32.** The potential for a double recovery here can be seen most easily in the context of the payment for Haan's NTS stock. Formally, this was a two-stage transaction: first, Telesphere borrowed funds from the Lenders (assuming obligations and transferring security interests for cash); second, Telesphere bought Haan's stock (transferring cash for stock). However, in order to recover against the Lenders, Telesphere must collapse the transaction, and view it as one in which Telesphere assumed obligations and transferred security interests to the Lenders in direct exchange for Haan's stock. Then, if the stock was worthless, those obligations, and the accompanying transfer of security interests, could be entirely avoided, with Telesphere owing nothing to the Lenders, but being required to return the stock to them. To recover against Haan, Telesphere must *not* collapse the transaction. It must instead focus on the second step—the exchange of cash for stock—and assert that the stock was not worth the cash paid, allowing avoidance of the second step of the transaction only, with Telesphere taking back the cash and surrendering the stock to Haan but retaining an obligation to the Lenders. To the extent Telesphere recovers from the Lenders on the collapsing theory, it cannot recover from Haan. To allow such a result would both give Telesphere the cash it paid to Haan *and* relieve Telesphere of the obligation to repay the loan that generated the cash.

avoided, there would be a net litigation benefit to the non-settling creditors of $10.6 million, with a distribution of over 16% on their claims.[33]

## C. The value of the settlement.

The valuation of the settlement is again complex, because the settlements involve numerous items of value, including claim subordination and extension of new credit. In order to gauge the value of the settlement, it is necessary to observe how its terms affect the likely distribution to non-settling creditors, using the same methodology as applied to the issue of the benefit of pursuing litigation.

*Priority of claims.* Under the proposed settlements WTG and the Lenders have agreed to subordinate their claims so as to allow an earmarked fund of $6.7 million to be distributed to other creditors. The effect of the subordination is considered below.

*Amount of Claims.* Under the terms of the proposed settlement, the claims allowed to WTG and the Lenders are substantially reduced, as follows:

| Creditor | Estimated Amount of Allowed Administrative and Priority Claims | Estimated Amount of General Unsecured Claims |
|---|---|---|
| 1. Lenders | $1,500,000 [34] | $ 38,000,000 [35] |
| 2. WTG | $1,700,000 [36] | $-0- [37] |
| 3. Non-settling creditors | $6,500,000 | $ 65,000,000 |
| Total | $9,700,000 | $103,000,000 |

*Funds in estate.* The settlement also makes a substantial change in the funds available in the estate. As noted above, at the time of the settlement hearing, Telesphere had unencumbered cash in an amount slightly less than $4 million, augmented by a $1.5 million escrow account. To this $5.5 million base, the court added $5 million in expected recoveries not related to the NTS transaction, leaving $10.5 million in the estate. The settlement adds to this:

| | |
|---|---|
| $2,800,000 | Cash payment from Lenders. TS ¶ 5(a). |
| 1,500,000 | New loan from Lenders. TS ¶ 5(b). |
| 1,600,000 | Tax and miscellaneous receipt escrows. TS ¶ 5(c), 6(a)(ii); Geller Trans at 101–02. |
| $5,900,000 | Total |

This results in an estimated estate, under the settlement, of about $16.4 million.

*Benefit to non-settling creditors.* The proposed settlement specifies payments to credi-

33. The estate available for distribution in this situation would be $47 million ($26 million net from the WTG loan, and $21 million for the NTS stock purchase). The unsecured claims against this estate would be $287 million—consisting of WTG's $190 million claim, the non-settling creditors' claims of $65 million, and a $32 million claim for the Lenders (their $38 million deficiency claim reduced only by the $6 million in professional fees paid from the loan proceeds). The non-settling creditors' share of the estate is about 23% (65/292) or $10.6 million.

34. The settlement calls for the Lenders to make a new $1.5 million loan to help fund the $6.7 million priority payment to non-settling creditors. TS ¶ 5(b).

35. Although the Lenders agree in the settlement to give up their claims to the tax escrow, thus decreasing the collateral available to support their claims, they have agreed to the same $38 million secured claim that the court found would be in effect without the settlement. TS ¶ 6(b).

36. As part of the settlement, WTG agreed to reduce its administrative claim from $4.1 million to $1.7 million. TS ¶ 6(d).

37. The settlement provides that WTG waive its entire unsecured claim. TS ¶ 6(c).

tors in a revised order of priority. TS ¶ 10(d). However, with the estate large enough to pay all administrative claims in full, the only effect of the altered priority is to make a $6.7 million distribution to the non-settling creditors prior to a pro rata distribution on all general unsecured claims. With an estate as estimated above, this distribution scheme would result in the following:

| | |
|---|---|
| Payment of priority claims: | $ 9,700,000 |
| Priority payment to nonsettling creditors | 6,700,000 |
| Balance to be distributed pro rata | –0– |
| Total | $16,400,000 |

The $6.7 million distribution to non-settling creditors under the proposed settlement exceeds the likely return to them if litigation regarding the NTS transaction is pursued only against WTG and the Lenders.

*Impact of Telesphere's right to pursue other defendants.* The proposed settlement is structured to allow Telesphere to continue to pursue claims arising from the NTS transaction against defendants (such as Haan and Galesi) other than WTG and the Lenders, and even provides a litigation fund for that purpose. The settlement does not result in a full avoidance of the transaction, and hence further recoveries would appear possible under Section 550(c). Because of the waiver of the WTG unsecured claim, any recovery against other defendants would provide the non-settling creditors with a larger distribution than they would otherwise have received. Thus, if the estate were increased by a $10 million additional net recovery (resulting in an estate of $26.4 million), the distribution would be as follows:

| | |
|---|---|
| Payment of priority claims: | $ 9,700,000 |
| Priority payment to nonsettling creditors | 6,700,000 |
| Balance to be distributed pro rata | 10,000,000 |
| Total | $26,400,000 |

The nonsettling creditors would receive about 63% (65/103) of the funds available for pro rata distribution, in this example, about $6.3 million, for a total distribution of $13 million, a 20% distribution. This is substantially more than the non-settling creditors would have received if litigation were pursued against the same defendants in the absence of a settlement.

*D. The settlement and the reasonable range of litigation possibilities.*

From the preceding discussion it is apparent that the proposed settlement is within the reasonable range of litigation possibilities, and may even exceed this range. If the estates are relatively small, the settlement provides a minimum distribution, funded by the Lenders, and effectuated by partial subordination of the claims of both the Lenders and WTG. If the estates are larger, the settlement results in a larger proportion being paid to the nonsettling creditors, primarily as a result of the waiver of WTG's unsecured claim.

 Tamona has suggested that the settlement with WTG be approved, but that the settlement with the Lenders be rejected. This is not possible. Although the terms of the settlement can certainly be seen as involving separate transactions, and although WTG indicated its willingness to enter into a separate transaction, in fact the proposed settlement is an integrated package, with the agreements of WTG and the Lenders mutually dependent. The settlement has been presented to the court as a whole, and must be approved or rejected on that basis. Tamona may be correct that the Lenders are not contributing an amount equivalent to a judgment avoiding the NTS transaction, but this is not the standard for approval and, as noted earlier, the lack of a full satisfaction is actually a prerequisite to further action against other defendants.

From the evidence presented at the hearing it is evident that the proposed settlement is in the best interest of the Telesphere estates.

**Conclusion**

For the reasons set forth above, the court grants the motion to approve the proposed settlement. A separate order will be entered in conformity with this opinion.