**In re Ted A. KIEFFER and Annbritt P. Kieffer, Debtors.**

**In re Thadis Carl Tanksley, Debtor.**

Nos. 00–62317, 01–61178.

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

Jan. 23, 2004.

■■■■■■■■■■■■■■■■■

---

Anne Piero Silagy, Esq, Canton, OH, Chapter 7 Trustee.

Shawn C. Groff, Macala, Baasten, McKinley and Gore LLC, Canton, OH, for debtors.

Francis J. DiCesare, Cincinnati, OH, Eric J. Slifer, Malvern, PA, Lance J. VanderLinden, Dallas, TX, for creditor.

## MEMORANDUM OPINION

RUSS KENDIG, Bankruptcy Judge.

Before the court are final reports of Chapter 7 Trustee Anne Piero Silagy (hereafter "Trustee") and applications for compensation of Trustee and Roetzel and Andress (hereafter "Counsel") filed in two cases.[1] In the interest of judicial economy, these matters have been consolidated for decision.

### Jurisdiction

The court has jurisdiction over these matters pursuant to 28 U.S.C. § 1334(a), the general order of reference entered in this district on July 16, 1984 and 28 U.S.C. § 157(b)(1).

### Facts

#### I. The Kieffers' Case

On July 18, 2000, Ted A. Kieffer and Annbritt P. Kieffer (hereafter collectively "Kieffers") filed a Chapter 7 bankruptcy case. Trustee was appointed on July 19, 2000. The first meeting of creditors was continued to September 12, 2000 by virtue of a notice of adjournment filed by the Kieffers' counsel on August 30, 2000. The September 12, 2000 meeting of creditors was held and continued to September 19, 2000 in order for the Kieffers to submit documentation to Trustee.[2] In the meantime, on September 13, 2000, Trustee filed a request for notice to creditors to file proofs of claim because assets would be available for distribution. On October 12, 2000, Trustee filed an application to employ Counsel, which was granted on November 1, 2000.

Trustee objected to a motion for relief from stay and abandonment of First Union National Bank of Delaware fka First Union Home Equity Bank, N.A. (hereafter "First Union") on the ground that the Kieffers' statements at the meeting of creditors led Trustee to believe that First Union held an avoidable mortgage on the Kieffers' real property.[3] First Union withdrew its motion on December 26, 2000.

Counsel filed a notice of proposed sale of personal property and motion to sell free and clear of liens, claims and encumbrances. This sale related to the Kieffers' fifty percent stock interest in APK, Inc.,[4]

---

1. Although these matters were noticed for hearing, hearings usually are not held on final reports. The lapse of time following the "hearing date" caused Trustee to request a hearing to further explain the circumstances of these cases. This hearing was held October 28, 2003.

2. This is apparent from the September 12, 2000 minutes of the meeting of creditors and the September 19, 2000 minutes of the meeting of creditors, which indicates that the September 19, 2000 meeting was not held

because Trustee received the requested documents in the interim.

3. Trustee's objection to the motion for relief from stay and abandonment was filed on November 29, 2000. Counsel then filed a response on December 7, 2000 reiterating Trustee's objection, only in more detail this time.

4. Information on the Kieffers' statement of financial affairs indicates that the Kieffers had an interest in a bar owned by APK, Inc. at the time of filing their bankruptcy.

which Trustee proposed to sell to Ernest Constante (hereafter "Constante"), the other fifty percent shareholder of APK, Inc., for $10,000.00.[5] This sale was approved on January 19, 2001.

On March 30, 2001, Trustee filed her first interim report listing three assets of potential value. They were the stock that had previously been sold, the real property with the allegedly defective mortgage and a liquor license in the name of APK, Inc. Trustee valued the stock and real property interest at a combined $10,000.00 in the report. There was no valuation listed for the liquor license. Subsequently, Trustee filed additional interim reports on October 11, 2001, April 2, 2002 and October 15, 2002. The April 2, 2002 interim report indicated that the estate's interest in the real property would be abandoned. No mention was made of the interest in the liquor license. The October 15, 2002 interim report indicated that the only activity preventing the closing of the case was the filing of a fee application.

On July 2, 2001, Counsel filed its first and final application for compensation and reimbursement of expenses for services rendered and expenses incurred from October 25, 2000 through April 30, 2001. Counsel requests $1,058.00 in fees, for 5.20 hours of work at a blended hourly rate of $205.00,[6] and $42.60 in expenses. Counsel's fees relate to the following work performed as detailed in Exhibit A of its application for compensation:

| Date | Initials | Hours | Description |
|---|---|---|---|
| 10/25/00 | BRS | 1.00 | Review file and debtor interest in A.P.K., Inc. and review filings with Ohio Secretary of State (.80) Draft letter to other shareholder regarding estate's interest (.20) (1.00) |
| 11/22/00 | BRS | 0.30 | Follow-up on recovery of stock interests of debtor; Telephone conference with Debtor's counsel regarding same (.30) |
| 12/06/00 | BRS | 0.80 | Prepare trustee's response to motion for abandonment (.20) Telephone conference with E. Constante regarding estate's interest in corporation and bar and settlement (.40) Telephone conference with trustee regarding same (.20)(.80) |
| 12/07/00 | BRS | 0.50 | Follow-up on real estate mortgage issues and claim against bar (Stark) (.20) Telephone call from counsel for corp. regarding estate's interest in bar (.30)(.50) |
| 12/28/00 | BRS | 0.20 | Telephone conference with counsel for E. Constante regarding resolution as to estate claim upon stock (.20) |
| 01/12/01 | BRS | 0.20 | Telephone conference with counsel for E. Constante regarding purchase of stock; Follow-up and advise trustee of sale |
| 01/15/01 | BRS | 1.00 | Review file and prepare notice of sale of stock (review claims regarding same and transfer of stock issues) (1.00) |
| 02/14/01 | BRS | 0.50 | Review file and prepare order approving sale of stock (.50) |

5. Based on the timely filed proofs of claim and the estimated administrative expenses, Trustee anticipated that the $10,000.00 purchase price would result in a one hundred percent distribution to creditors.

6. Counsel billed 2.80 hours of time at $185.00 per hour in 2000 and 2.40 hours of time at $225.00 per hour in 2001.

| | | | |
|---|---|---|---|
| 03/13/01 | BRS | 0.20 | Letter to V. Schaffer regarding closing of sale (.20) |
| 4/05/01 | BRS | 0.10 | Telephone call from V. Schaffer regarding payment per court order (.10) |
| 04/09/01 | BRS | 0.20 | Letter from V. Schaffer regarding settlement; Letter to Trustee regarding same (.20) |
| 04/12/01 | BRS | 0.20 | Discuss conclusions of case with Trustee and payment and tax consequences of sale of stock (.20) |

**Professional Services** $ 1,058.00

The final report and account, filed January 31, 2003, indicates that Trustee recovered $10,258.70 for creditors, minus a $16.67 disbursement made for a bond premium. Trustee's accompanying application for compensation and reimbursement of expenses requests $1,769.94 in compensation, pursuant to 11 U.S.C. § 326, and $32.26 for expenses.

Trustee explained that the case involved a dispute between the co-owners of a corporation that owned the liquor license for a local bar. The Kieffers, although fifty percent owners, were locked out. Given this history, Trustee immediately hired Counsel and did not take any action to contact the co-owner. The facts reveal that, following the usual uncertainty encountered with an unsophisticated co-owner in these types of cases, Constante hired a lawyer who promptly negotiated with Counsel to purchase the estate's interest.

## II. The Tanksley Case

On March 28, 2001, Thadis Carl Tanksley (hereafter "Tanksley") filed a Chapter 7 bankruptcy case. Trustee was appointed on March 29, 2001. The first meeting of creditors was held May 22, 2001 and then continued to June 12, 2001, June 26, 2001 and July 10, 2001 in order for Tanksley to submit documentation to Trustee.[7] On July 12, 2001, Trustee filed a request for notice to creditors to file proofs of claim because assets would be available for distribution. On February 22, 2002, Trustee filed an application to employ Counsel, which was approved on March 25, 2002.

On October 11, 2001, Trustee filed her first interim report. This report did not list any property with nonexempt equity. The subsequent interim report, filed April 2, 2002, reported that Counsel had been retained to file a complaint. The interim report filed October 15, 2002 reported the same information.

On April 24, 2002, Counsel filed a notice and motion for authority to compromise. The notice and motion related to nonexempt equity in money on deposit in a bank account on the date of the bankruptcy filing, avoidance of an allegedly fraudulent transfer of a down payment for the sale of real property, avoidance of an allegedly fraudulent transfer of sale proceeds from the sale of real property and nonexempt equity in real property owned by Tanksley. The motion to compromise the claims against Tanksley for $7,500.00 was granted on June 14, 2002.

On October 24, 2002, Counsel filed its first and final application for compensation and reimbursement of expenses for services rendered and expenses incurred from

---

7. This is apparent from the minutes of the meeting of creditors filed May 24, 2001, June 14, 2001 and July 13, 2001.

February 13, 2002 through July 31, 2002. Counsel requests $1,147.50 in fees, for 5.10 hours of work at an hourly rate of $225.00, and $35.40 in expenses. Counsel's fees relate to the following work performed as detailed in Exhibit A of its application for compensation:

| Date | Initials | Hours | Description |
|------|----------|-------|-------------|
| 02/13/02 | BRS | 0.50 | Review with Trustee facts of case, claims and prior demands of trustee |
| 03/05/02 | BRS | 0.70 | Review closing statement regarding sale of property, property interests of debtor and amounts due estate (.50) Review with Trustee facts (.20)(.70) |
| 03/06/02 | BRS | 0.80 | Further review of file; Letter to debtor's counsel requesting turnover of assets and review of trustee's claims (.80) |
| 03/18/02 | BRS | 0.20 | Telephone call from B. Cypensky [sic] regarding debtor's turnover of property and claims of fraudulent transfer (.20) |
| 03/26/02 | BRS | 0.10 | Telephone.call from counsel for Lemmon & Lemmon regarding turnover of funds |
| 04/04/02 | BRS | 0.20 | Letter to Trustee regarding Lemmon & Lemmon receivable (.10) Letter to Debtor's counsel regarding follow-up on turnover and information previously requested by Trustee (.10)(.20) |
| 04/18/02 | BRS | 1.20 | Prepare for meeting with Debtor's counsel (.20) Meet with Debtor and Debtor's counsel regarding estate's claim for fraudulent transfer, recovery of estate assets (1.00) (1.20) |
| 04/19/02 | BRS | 1.10 | Telephone call from Mr. Tanksley regarding terms of settlement (.10) Prepare notice of compromise (1.00) Telephone conference with court and obtain hearing date (No Charge) (1.10) |
| 06/10/02 | BRS | 0.30 | Review file and notice; Prepare order approving compromise with debtor (.30) |

**Professional Services** **$1,147.50**

The final report and account, filed January 30, 2003, indicates that Trustee recovered $16,794.47 for creditors. Trustee's accompanying application for compensation and reimbursement of expenses requests $2,429.45 in compensation, pursuant to 11 U.S.C. § 326, and $32.80 for expenses.

Trustee explained in detail that Tanksley was uncooperative and she hired Counsel after failing to obtain Tanksley's cooperation.

### Analysis

**I. Statutory Authority for Retention of Counsel and Allowance of Compensation**

 Section 327(a) [8] of the Bankruptcy Code authorizes a trustee to employ an

---

8. Section 327(a) provides:

Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested per-

attorney to represent or assist the trustee in carrying out the trustee's duties, with limitations set forth in 11 U.S.C. §§ 328(a)[9] and 330(a)(1)(A) and (B). Under § 330(a)(1)(A) and (B), counsel for a trustee may be awarded "reasonable compensation for actual, necessary services rendered" and "reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1)(A) and (B). Section 330(a)(3)[10] describes what courts are to consider when determining whether compensation is reasonable:

> In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services are necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexi-

ty, importance, and nature of the problem, issue, or task addressed; and

> (E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

■ "The standard governing the award of attorney fees has undergone a metamorphism since the turn of the century." *In re Holder,* 207 B.R. 574, 581 (Bankr. M.D.Tenn.1997). Pursuant to the Bankruptcy Act of 1898, the "spirit of economy" prevailed. *Id. (citing In re Taxman Clothing Co.,* 49 F.3d 310, 313 (7th Cir. 1995); *In re Allied Computer Repair, Inc.,* 202 B.R. 877 (Bankr.W.D.Ky.1996)).* Under this standard, "conservation of the estate was the overriding concern and far outweighed any concern for compensating attorneys. Therefore, an attorney practicing bankruptcy law generally garnered lower fees than attorneys rendering comparable services in other areas of law." *Id.* at 581, n. 8 (*citing Taxman,* 49 F.3d at 313). The fee landscape changed in 1978 with the enactment of the current Bankruptcy Code, which " 'demoted the policy

---

sons, to represent or assist the trustee in carrying out the trustee's duties under this title.
11 U.S.C. § 327(a).

**9.** Section 328(a) provides:
The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employ-

ment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.
11 U.S.C. § 328(a).

**10.** "Section 224 of the Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, rewrote section 330(a). In doing so, the 1994 Act added two subparagraphs numbered 330(a)(3)(A). It appears that the first reference to paragraph 330(a)(3)(A) is extraneous." Alan N. Resnick, et al., *2004 Collier Pamphlet Edition, Bankruptcy Code* § 330, n. 1 (Matthew Bender & Co.2003). Accordingly, the reference to subparagraph (A) will be ignored.

of preserving estate assets from its controlling status.'" *Id.* at 581 (*quoting Allied Computer Repair*, 202 B.R. at 881). "The new policy governing the award of attorney fees became 'costs of comparable services' standard." *Id.* This new standard meant that "courts were to look beyond the bankruptcy proceedings and balance fees charged by other attorneys for comparable services." *Id.* (*citing Taxman*, 49 F.3d at 313; *Allied Computer Repair*, 202 B.R. at 881).

■ Keeping the boundaries of § 330 in mind, courts historically have utilized the lodestar standard as a base for determining the reasonableness of compensation. *See Gisbrecht v. Barnhart*, 535 U.S. 789, 800–02, 122 S.Ct. 1817, 152 L.Ed.2d 996 (2002); *In re Mansfield Tire & Rubber Co.*, 65 B.R. 446, 451–52 (Bankr. N.D.Ohio 1986). The lodestar standard is calculated by multiplying a reasonable number of hours spent on a case times a reasonable hourly rate. *In re Eliapo*, 298 B.R. 392, 398 (9th Cir. BAP 2003). The lodestar standard has been applied in the bankruptcy context. *E.g., In re Boddy*, 950 F.2d 334 (6th Cir.1991).

> Because the [Bankruptcy] Code provides for attorney's fees, and because the plain language of the Code indicates Congress intended no distinction between attorney's fees in bankruptcy cases and those awarded in non-bankruptcy cases, the courts have generally relied upon the lodestar approach when determining attorney's fees in bankruptcy cases. We join these courts in adopting the lodestar method of fee calculation for bankruptcy cases.

*Id.* at 337 (citations omitted).

■ The lodestar standard is an objective starting point, but the inquiry does not end there. *Hensley v. Eckerhart*, 461 U.S. 424, 433–34, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Qualitative factors may be placed into the equation. *Id.* at 434, 103 S.Ct. 1933; *see also In re Vista Foods USA, Inc.*, 234 B.R. 121, 129 (Bankr.W.D.Okla.1999) (lodestar test, with proper enhancements, is the appropriate method of calculating reasonable compensation for counsel to trustee).

The qualitative factors may include:

1. the requisite time and labor;

2. the novelty and difficulty of the issues;

3. the requisite skill;

4. the preclusion of other employment;

5. the customary fee;

6. the risk incurred;

7. time limitations;

8. the amount involved and the results obtained;

9. the experience, reputation and ability of the counsel;

10. the desirability of the case;

11. the nature and length of the case; and

12. the results obtained in similar cases.

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974).[11]

---

**11.** The Sixth Circuit Court of Appeals has shown some disfavor for these qualitative factors in the past. *See Northcross v. Bd. of Educ. of Memphis City Sch.*, 611 F.2d 624, 642–43 (6th Cir.1979). However, more recently, in *Boddy*, the court stated:

> The bankruptcy court also may exercise its discretion to consider other factors such as the novelty and difficulty of the issues, the special skills of counsel, the results obtained, and whether the fee awarded is commensurate with fees for similar professional services in non-bankruptcy cases in the local area. In many cases, these factors will be duplicative if the court first determines the lodestar amount because the lodestar presumably subsumes all of these factors in its analysis of the *reasonable*

As the court stated in *In re Penn–Dixie Indus., Inc.*, 18 B.R. 834 (Bankr.S.D.N.Y. 1982):

> The criteria for fee awards variously stated contain three main elements: (1) the quantity factor: documented time spent and customary billing rates; (2) the quality factor: the quality of advocacy required and delivered, taking into account the novelty and difficulty of the issues presented, skills called for, time constraints, and counsel's personal qualifications; (3) the result factor: the bottom line amount recovered for the estate and its creditors (as well as the degree of speed from loss to recovery). Consideration of these broadly stated fee formulation factors permits the court to focus on a firm's baseline time charges, and for cause, modestly enhance or sharply curtail them.... Analysis of the case law confirms that rigidity in the application of fee guidelines has never been the rule. Thus, courts have generally been free to ponder all the variables of a particular case and avoid ill-suited emphasis on a particular guideline.

*Id.* at 838–39 (citation omitted).

■■ The burden of proof as to entitlement to and reasonableness of a fee request is upon the moving party. *In re Mansfield Tire & Rubber Co.*, 65 B.R. at 455. Even where no objections have been raised to an application for compensation,

the court is still charged with conducting an independent examination of that application. *Id.*; 11 U.S.C. § 330(a)(2).

## II. Attorney Fees in Smaller, Less Complicated Cases

■ The Kieffers and Tanksley cases are two examples of relatively uncomplicated asset cases routinely seen in this court. These two cases are less troubling than many others because there was a meaningful recovery and dividend in these cases. Nonetheless, these cases offer a convenient platform for discussing and resolving recurring attorney for trustee fee issues. A review of the assets recovered and the legal work performed provides instruction about the appropriate hourly rate to be charged by Counsel.

> The Court should be mindful that not all services should carry the same compensation.... The fact that an experienced attorney elects to perform routine ministerial services which could be performed by others far less experienced does not increase the value and should not increase the cost to the estate for these services.

*In re Union Cartage Co.*, 56 B.R. 174, 178 (Bankr.N.D.Ohio 1986); *see also In re Ferkauf, Inc.*, 42 B.R. 852, 858 (Bankr. S.D.N.Y.1984) ("[T]he hourly fee awarded should be adjusted when a significant percentage of the total work completed is of

---

hourly rate and the *reasonable* hours worked.
*Boddy,* 950 F.2d at 338 (citation omitted) (emphasis in original); *see also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564–66, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986).
> This seems to be the more well-reasoned opinion as § 330(a)(3) provides that a court should consider all relevant factors in determining the reasonableness of compensation, including the benefit to the estate, the complexity, importance, and nature of the issues in the case, and comparable compen-

sation in nonbankruptcy cases. Thus, the Code provides explicit support for the factoring in of qualitative components in the language "all relevant factors" and "the nature, the extent, and the value of ... services."
*In re Ohio Indus., Inc.*, 299 B.R. 853, 858 n. 3 (Bankr.N.D.Ohio 2003) (*quoting* 11 U.S.C. § 330(a)(3)). The distinctions between the components of the two approaches are so small that they are indistinguishable when stirred into the fee stew. *See also In re Phillips*, 291 B.R. 72, 80 n. 31 (Bankr.S.D.Tex. 2003).

such a routine nature. Compensation for routine work should be discounted."); *In re International Coins & Currency, Inc.,* 22 B.R. 127, 130 (Bankr.D.Vt.1982) (ministerial services should be compensated at a lower rate than "truly legal services"); *In re Absco, Inc.,* 23 B.R. 250, 251–52 (Bankr. E.D.Pa.1982) (extraordinary and difficult issues merit a higher fee; work of lesser value merits a lesser rate).

## A. Routine Matters

The first category of legal matters, which the court classifies as "routine," are those activities involving relatively standardized notices, objections and motions that occur regularly in bankruptcy practice. These are reduced to forms in many cases, including most smaller asset cases. A nonexhaustive list of such routine matters includes the following:

1. A motion for turnover of a tax refund;

2. A motion for a Federal Rule of Bankruptcy Procedure 2004 examination;

3. An objection to claims of exemption;

4. An objection to a motion for relief from stay; or

5. A notice of sale in an extremely simple situation.

## B. Traditional and Unproblematic Matters

The second category of legal matters, which the court terms traditional and unproblematic ("traditional" for short), is that which, although requiring a greater degree of sophistication than routine matters, occurs regularly and does not involve unique applications of the law or intricate and involved financial details. These matters are the bankruptcy equivalent of auto accident and premises liability cases for defense lawyers. They require an understanding of an area of the law, but the cases repeat. The facts are not confoundingly complicated, although they may be disputed. There may be a dispute as to whether the light was red or the floor was wet, but those issues do not involve mindbending novelty. Medical issues, particularly back injury, require sophistication, but the same medical issues recur with mindnumbing regularity.

Similar recurring issues exist in these bankruptcy matters termed as traditional. While the fees counsel charge can be adjusted upward if the recovery is truly contingent, for example, a long case with factual issues, often these matters are neither tricky nor contingent. A nonexhaustive list of examples of traditional matters includes:

1. More involved notices of sale and matters attendant thereto;

2. Preference actions in which neither the facts nor the application of the law is unusually complicated;

3. Transfers of assets for less than fair consideration and other avoidance actions in which neither the facts nor the application of the law is unusually complicated; or

4. Recently popular and legislatively sunsetted mortgage avoidance cases revolving around the dispositive issue of whether both witnesses were present at the execution of the mortgage.

## C. Trustee Duties and Rates

A recurring issue in these routine and traditional matters is the appropriate hourly rate and the line between attorney duties and trustee duties.

In the Kieffers' case, Counsel filed a notice of sale of the Kieffers' fifty percent stock interest in a corporation and objected to a motion for relief from stay. These matters are of the sort that are routinely filed by a trustee or a trustee's counsel in

a bankruptcy case. Counsel spent 5.20 hours on these matters at a blended hourly rate of $205.00.[12]

In the Tanksley case, Counsel negotiated the turnover of assets and the avoidance of allegedly fraudulent transfers. Tanksley sold real estate to his son but did not receive the deposit or closing proceeds, both totaling $6,728.61. Additionally, Tanksley was the co-owner of vacant land with net equity of approximately $2,500.00. Counsel spent 5.10 hours on these matters at a rate of $225.00 per hour.

## III. Trustee Duties

Section 704 of the Bankruptcy Code sets forth the duties of a trustee.

The trustee shall—

(1) collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest;

(2) be accountable for all property received;

(3) ensure that the debtor shall perform his intention as specified in section 521(2)(B) of this title;

(4) investigate the financial affairs of the debtor;

(5) if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper;

(6) if advisable, oppose the discharge of the debtor;

(7) unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest;

(8) if the business of the debtor is authorized to be operated, file with the court, with the United States trustee, and with any governmental unit charged with responsibility for collection or determination of any tax arising out of such operation, periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires; and

(9) make a final report and file a final account of the administration of the estate with the court and with the United States trustee.

11 U.S.C. § 704.

### A. Self–Retention Historically

▅▅▅▅ In order for a trustee to accomplish the duties imposed by the Bankruptcy Code, a trustee can hire independent counsel or a trustee can hire her own firm or herself as counsel. 11 U.S.C. § 327(d) ("The court may authorize the trustee to act as attorney . . . for the estate if such authorization is in the best interest of the estate.").[13] There is a limitation imposed by 11 U.S.C. § 328(b) on the trustee's compensation.

If the court has authorized a trustee to serve as an attorney or accountant for the estate under section 327(d) of this title, the court may allow compensation for the trustee's services as such attorney or accountant only to the extent that the trustee performed services as attor-

---

**12.** The rate jumped from $185.00 per hour in 2000 to $225.00 per hour in 2001 for one attorney.

**13.** "Under the Bankruptcy Act, there was uncertainty as to whether a trustee could retain his own law firm as attorneys for the trustee." *In re K & L, Inc.*, 205 B.R. 589, 591 (Bankr.

D.Neb.1991) (*citing 2 Collier on Bankruptcy* ¶ 327.03[1] at 327–19 (15th ed.1991)). "This uncertainty was addressed by the Bankruptcy Code in 11 U.S.C. § 327(d), which empowers a court to authorize a trustee to act as his own attorney or accountant." *Id.*

ney or accountant for the estate and not for performance of any of the trustee's duties that are generally performed by a trustee without the assistance of an attorney or accountant for the estate.

11 U.S.C. § 328(b).

The House Report regarding § 328(b) makes clear that Congress changed this statute with the intention of cutting costs by allowing the trustee to retain himself or herself as counsel.

*The purpose of permitting the trustee to serve as his own counsel is to reduce costs.* It is not included to provide the trustee with a bonus by permitting him to receive two fees for the same service or to avoid the maxima fixed in section 326. Thus, this subsection requires the court to differentiate between the trustee's services as trustee, and his services as trustee's counsel, and to fix compensation accordingly. Services that a trustee normally performs for an estate without assistance of counsel are to be compensated under the limits fixed in section 326. Only services that he performs that are normally performed by trustee's counsel may be compensated under the maxima imposed by this section.

H.R.Rep. No. 95–595, at 329 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6285 (emphasis added).

"The benefit to retain oneself under § 327(d), however, is not without its burdens. The trustee-attorney must clearly demonstrate to the Court that 'the services for which attorneys fees are sought are not duties generally performed without the assistance of counsel.'" *In re Howard Love Pipeline Supply Co.*, 253 B.R. 781, 788 (Bankr.E.D.Tex.2000) (*quoting In re Gary Fairbanks, Inc.*, 111 B.R. 809, 811 (Bankr.N.D.Iowa 1990)).

When the trustee-attorney applies for compensation for legal services rendered to the estate, such application is evaluated upon the basis of whether such legal services were actual and necessary and, significantly, there is no statutory limitation imposed upon the amount of compensation which may be awarded to the trustee-attorney in that context. Thus, while the retention of the trustee in a dual capacity as attorney was primarily designed as a means by which to reduce the amount of administrative expenses incurred by a bankruptcy estate, such dual retention also creates a potential vehicle by which the statutory limitation on trustee compensation might be effectively circumvented, thereby actually increasing the amount of administrative expenses, if the trustee-attorney is permitted to transform what otherwise would be characterized as trustee services into legal services.

*Id.* at 787 (footnote omitted).

Historically, great fear was expressed for the potential for abuse in the trustee hiring herself or her firm as counsel. This fear was well-grounded in the potential for abuse in paying the trustee as attorney for performing trustee duties. The trustee could stuff into two pockets what could not be stuffed into one.

In the local market, this fear has been supplanted by the reality of trustees retaining counsel in simple cases, many far simpler than those before the court in this opinion. In such cases, the attorney is hired to perform a legal service, such as the notice of sale for real or personal property. The attorney eventually takes over control of most of the case, such as contacting the auctioneer, chatting with interested purchasers for assets, forwarding checks and the like. This is all done at substantial hourly cost.

This avoids the perceived fear of self-retention. The trustee does not fill two of

his or her pockets. Rather, two different people fill two unrelated pockets, but the result is the same-excessive cost. If the trustee's commission is fully allowed, the incentive is clear. The trustee may use this time freed up by the counsel's management of the case for other paying work or otherwise.

## B. Self–Retention in Reality

The phenomenon of outside counsel performing broad duties in simple cases is peculiarly regional and, in some respects, local. This problem is so large because the cases are so small. This court is somewhat unique in the number of small estates that are administered. According to the 2000 Census, Ohio contained 11,353,140 of the 281,421,906 people in the United States. *United States Census 2000*, U.S. Census Bureau, *http://eire.census.gov/pop est/data/states/tables/NST–EST2003–01.- php* (last visited on January 21, 2004). This is very close to 4% of the Unites States population.

Yet, according to reports issued by the Office of the United States Trustee, Ohio accounted for over 11% of all asset cases less than $5,000.00. Ed Flynn et al. *Chapter 7 Asset Cases: Part II*, American Bankruptcy Institute Journal, May 2003, at 63. If a few other states that administer many small asset cases are excluded, the differences balloon.[14]

The extremes are truly extreme. The largest bankruptcy court in the country, the Central District of California, only closed nine cases per ten thousand in which there were assets of $5,000.00 or less. *Id.* The court has been unable to find this same discrete calculation in the reports located, but by interpolating data from the same time period, it appears that the rate in Ohio is in the vicinity of twenty-five to fifty times that great! Trustees in some parts of the country report that they do not open a case for less than $10,000.00. Although these are anecdotal and reported in conversation, the statistics render these statements believable.

The instant cases do not fall within the neatly defined category of $5,000.00. The assets exceeded $10,000.00, but the fee-related issues remain the same. The available law is not instructive. Most of the reported fee cases are not helpful, and many are patently inapplicable, because they deal with higher value asset cases in which the dynamics are materially different. Both heart transplants and blood pressure screenings are critical to cardiac care, but no one suggests the same framework for delivering the two services.

It is more difficult to develop bright line tests for some aspects of small dollar cases than large dollar cases. Whether something is a legal or administrative task may be clearer when the task is liquidating a multi-million dollar fraud than when the task is scraping together flotsam and jetsam in a $2,000.00 to $20,000.00 case.

If the trustee acts as his or her own counsel, the task is less complicated. The court can focus on the usual factors of legal/administrative, consider the overall result, and make a reduction if necessary. That process is complicated with separate counsel. Who should be the subject of

---

14. Five states accounted for nearly one-half of the small-asset cases closed (Florida (4,365), Ohio (3,305), Arizona (2,167), Nevada (1,803) and Louisiana (1,637)). These same five states account for just under 20 percent of the larger asset cases closed (2,029 of 10,320) and less than 16 percent of all chapter 7 case filings. At the other extreme were six states that each had less than 30 small-asset cases closed during the year (Delaware (5), New Mexico (12), New Hampshire (19), Rhode Island (26), Hawaii (28) and Mississippi (29)). *Id.*

reduction-the counsel or the trustee? The Tanksley facts raise a slightly different problem. What if the debtor's lack of cooperation reaches a point at which the trustee is justified in sending the matter to his or her counsel, but the debtor thereafter demonstrates a willingness to comply, obviating much of the need for counsel? Should the estate continue to pay for an attorney to conduct consensual negotiations where the recovery is limited? Counsel indicated that this is proper in the nonbankruptcy context in which clients turn matters over to attorneys, and therefore, this should not be treated differently. The court is not convinced that this is correct. For example, most commercial lending banks maintain a department for dealing with financially troubled loans. The loan is financially troubled because the customer is financially troubled. This department may be called the workout group, troubled loans, recovery, or otherwise. The goal is to get the best deal possible, through liquidation or rehabilitation of the customer. The departments are staffed by savvy specialists, sometimes including nonpracticing lawyers. Particularly in the smaller dollar loans, these departments do not leave the matter with attorneys with an instruction of "Call me when it's done or when you need authority." Rather, they direct the attorney to perform specific tasks, often leaving the attorney out of the loop for extended periods of time with an instruction of "I'll call you when I need you." The reason is obvious: to save money in a bad situation with limited dollars at stake. The analogy is evident.

The symbiosis between some trustees and their regular counsel is too obvious to miss by any standard except willful blindness. The same trustees routinely hire the same one or two attorneys at all times, regardless of the issue. The trustees become all too willing to pay any rate for any service that the court approves. The attorney will provide fantastic personal service and free the trustee's time for other paying endeavors while the trustee's commission is calculated as a fixed expense. In the Kieffers' matter, Counsel's hourly rate increased 22% overnight with no apparent distress. It is doubtful that many private practice lawyers have been able to sustain that type of increase in the local market without a great deal of negotiation and client loss.

The disconnect is that the American legal system is an adversarial system, and this piece of the bankruptcy system has no adversary. Moreover, the client (the trustee) is not dealing with his or her own money. The front line responsibility for controlling the cost of legal services has been shifted from the trustees to the court. This is not how the system was designed to operate.

> [O]ne of the express purposes of the [Bankruptcy] Code was to remove the bankruptcy judge from general estate administration, giving that task to the newly created office of United States Trustee. The House Report on the legislation that became the Bankruptcy Code states that the Code provides for a "separation of judicial and administrative functions currently performed by the bankruptcy judges," with the judges acting as "passive arbiters of disputes that arise in bankruptcy cases" and the United States trustees assuming "the bankruptcy judge's current supervisory roles."

*In re Telesphere Communications, Inc.,* 179 B.R. 544, 551 (Bankr.N.D.Ill.1994) (*quoting* H.R.Rep. No. 595, at 107 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6069). When the trustee drops the front line responsibility for controlling fees to the court, this results in the court acting

as a regulator and not a neutral or passive arbiter. This fundamentally upsets the purpose and design of the Code.[15] The creditors are dispersed, distant and not actively involved for these small sums. Budgetary restraints or other priorities in the Office of the United States Trustee have prevented it from aggressively pursuing this role.

Self-retention may have been frowned upon previously or thought to unnecessarily or inappropriately increase a trustee's potential fees. But if properly performed, it is more efficient and economical than the hiring of independent counsel by the trustee.

Several reasons make it true that a trustee acting as self-retained counsel will reduce expense to the estate in most cases. In fact, courts have frequently cited the legislative history to § 328(b), see discussion *infra* Part III.A., in noting that the reason for the change in the law allowing the trustee to serve as counsel was to decrease the expense to the estate. *See, e.g., In re Howard Love Pipeline Supply Co.,* 253 B.R. 781, 787 n. 6 (Bankr.E.D.Tex. 2000); *In re Adelson,* 239 B.R. 627, 630 (Bankr.S.D.Fla.1999); *In re Finney,* 1997 WL 33475580, * 24 (Bankr.E.D.Va.1997); *In re Abraham,* 163 B.R. 772, 780 n. 11 (Bankr.W.D.Tex.1994).

### 1. Communications Cost

When a trustee hires independent counsel, it is at the increased cost of communication between the trustee and the counsel. When a trustee is self-retained, the attorney/trustee cannot charge the estate for talking to himself or herself. However, when a trustee hires independent coun-

sel, there is the inherent need for the trustee to consult with counsel.

A good example is a straightforward sale of property. Some courts do not permit attorney fees to be charged for preparing the required notice of sale. This court does permit that charge, but this has led to the compounding of cost by the attorney charging for talking to the realtor and getting involved in discussions about closing and payment and related matters. This is part of the inherent inefficiency of adding a party to an uncomplicated transaction, often regardless of the size of the transaction.

Communication cost is a necessary cost of business in many large transactions, much like a leak in a bucket used to transfer water. It is much more difficult to justify this specific cost in smaller dollar cases because the cost of talk is disproportionate to the amount of money. This inefficiency cannot be recovered in an uncomplicated transaction.

### 2. The Lateral, the Siphon and Similar Phenomena

It is not only the cost of communications that makes the two party estate team more expensive, particularly in routine or uncomplicated cases. It is impossible not to notice two other recurring practices that drive up the cost.

The first is called the lateral. In this type of case, the trustee laterals most of his or her duties to the counsel except for report preparation. In a recent simple case involving the sale of one asset, a counsel for the trustee did it all and

15. See the testimony of Judge Keith M. Lundin as to the change in attitude regarding the role of the judge and the inappropriateness of judges policing fee requests. *Professional Fees in Bankruptcy: Hearing Before the Sub-*

*comm. on Courts and Admin. Practice,* 102nd Cong. 13–133 (1992) (statement of Judge Keith M. Lundin, United States Bankruptcy Court, Middle District of Tennessee).

charged for it all.[16] There were multiple charges for talking to the auctioneer about sale details, conversing with interested buyers and forwarding checks. The attorney fees were multiples of reasonable fees. The trustee did little but review claims and file the final report.

The siphon operates similarly but involves a couple of assets or issues. The trustee is more actively involved at the beginning, but more and more activities are gradually siphoned to the counsel as the case flows on.

These phenomena are the exact opposite of what is happening with sophisticated parties outside the bankruptcy context, which routinely require retention letters. Clients require retention letters to keep attorneys from wandering from the defined scope of the approved project in order to increase fees. Lawyers require retention letters to define the scope of the project in order to avoid liability for some arguably related matter that they could later be faulted for not remedying. By contrast, the practices identified herein not only allow excessive cost but cede control of the day-to-day management of cases from trustees to attorneys.

### 3. Loss of the "Partial Charge"

One billing practice utilized by some trustees who retain themselves as counsel helps to minimize the cost. This is what is called the partial charge. If the trustee/attorney is attending a function that implicates both trustee duties and legal duties, the time can be split in half with part charged as attorney time and part allocated as a trustee function. The trustee still earns reasonable overall compensation in the case. The cost of the transaction was lessened because one person

attended and not two. That is simple efficiency, not grinding reductions from participants.

This contrasts with a recent fee bill in an uncomplicated liquidation with a low dollar value. A negotiating session was held. The legal issues were not complex and the session should have been straightforward jawboning to determine if settlement was possible. The trustee skipped the negotiation. The attorney billed for all of the time, and the creditors had the additional pleasure of paying for the attorney to tell the trustee what had happened and to discuss the further course of action. Instead of a charge or a partial charge, the estate had a charge for the session plus a charge for reporting the news. Lawyers aspire to be the grease of commerce but in this scenario are the friction.

### 4. Two Pockets and the Psychological Minimum

It is invariably perceived that a certain amount must be received from any transaction for it to be worthy of involvement. This amount varies from person to person based upon a number of factors, but the problem is heightened if the "psychological minimum" is for two independent pockets, rather than one. This is particularly damaging as the value of the case declines. It is also more damaging if the parties have high overhead or other factors that militate against small amounts being charged in separate matters. Many firms even have minimum amounts that are expected to be charged before a file is to be opened.

### 5. The "Purely Legal" Distinction

One cost reduction strategy employed by trustees who act as their own counsel is

---

**16.** Neither the counsel nor the trustee in that case were the counsel or the trustee in the instant cases.

to charge for matters that they deem to be "purely legal" and to subsume other time in the trustee's commission in most consumer and modestly sized cases. In the Chapter 11 context, one court only allowed a lower fee for matters that were not "purely legal." *International Coins & Currency, Inc.*, 22 B.R. 127, 130 (Bankr. D.Vt.1982).

Again, this is not possible for an attorney who is not also the trustee. He or she must be compensated for all of the time spent on the case since he or she is not receiving any other commission. The net beneficiary is the trustee who offloads work at the expense of the creditors. Similarly, the attorney who is regularly retained may be compelled by the nature of the relationship to take cases that are known to be unlikely to pay, *e.g.*, revocation of a discharge, to keep the customer (the trustee) coming back. The attorney must make up this lost time on other matters for the trustee or lose money. The likely source is other cases and so other creditors pay.

The effect is the same even if the outside attorney is not liberally billing other cases. The overall rate must be set to capture a fair return for all work performed. As a result, paying cases subsidize the nonpaying cases through the function of an inflated rate.

The Kieffers' case is an example of a case in which the work was not primarily legal. Nearly the entire charge was negotiating payment for the stock and arranging a very simple closing exchange of stock for a check. It is questionable what was necessary as a legal service.

## 6. An Example from Two Previous Cases

Two final reports and requests for compensation came before the court on the same day and coincidentally involved the sale of similar assets but diverged in their request for fees based on one trustee's self-retention and another trustee's retention of independent counsel. *In re Owens*, No. 99–63245, slip op. at 1 (Bankr. N.D.Ohio 2002).[17] This illustrates the increased costs associated with a trustee's retention of independent counsel. *Id.* at 1–2.

In both cases, a motorcycle was the sole asset. *Id.* at 1. In the *Owens* case, the trustee employed independent counsel. *Id.* The final report indicated that the total recovery was $8,886.80. *Id.* The trustee requested statutory fees of $1,638.68 and expenses of $35.59, and her counsel requested fees of $407.00 and expenses of $43.40. *Id.* The counsel for the trustee billed 2.2 hours, totaling $407.00 in fees, for services relating to the sale, including drafting the notice of sale and order. *Id.* at 2. The trustee drafted the report of sale.[18] *Id.*

In the *Wagner* case, the trustee retained himself as counsel. *Id.* at 1. The total recovery was $11,271.19. *Id.* The trustee requested statutory fees of $1,777.12 and expenses of $17.80. *Id.* In his application for compensation as attorney for the trustee, he requested fees of $260.00, representing 2.0 hours of work, including drafting the report of sale and lodging an objection to an exemption claimed by the debtors, and expenses of $104.11.[19] *Id.* at 1–2.

---

**17.** The court engaged in a joint discussion of *In re Owens*, No. 99–63245 and *In re Wagner*, 00–63096 in its order of final allowance. *Id.*

**18.** If the counsel for the trustee had prepared the report of sale, the counsel's fees for services related to the sale would have been almost twice those in the second case.

**19.** The case was unusual in requiring service of the notice to 117 entities, resulting in unusually high expenses. *Id.* at 2, n. 3. The

The similarities in the assets sold and the disparities in the fees requested, owing to the variance in the time expended and the different hourly rates billed, illustrate how costs increase.

## IV. Hourly Rates

The law cited above is clear that there are no hard and fast rules. Nonetheless, the hourly rate is a beginning point, or at least a critical point, in all of the cases.

One consideration is the market. In 2001, attorney for trustee rates in Canton on all but the most unusual matters generally ranged from $90.00 per hour to $225.00 per hour. This divergence is baffling and unsupportable. There was a similarly confounding inconsistency as to what was charged as attorney time. Typically the attorney with the lowest rate charged for a host of trustee duties, but the total cost was within the range of reason in most cases, owing to the extremely low rate. However, one of the lower rate attorneys ($130.00 per hour) was a self-retained trustee who did not charge for many items charged by others.

Counsel pointed out that it faces a larger overhead being a large firm in a larger metropolitan area. Akron is located in Summit County, which has substantially higher rates owing, at least in part, to being in a larger metropolitan area with a higher cost of living. Canton is located in Stark County, Ohio for which the 2002 Census estimates a population of 369,007. *United States Census 2000,* U.S. Census Bureau, *http://www.census.gov/acs/www/Products/Profiles/Single/2002/ACS/OH.htm* (last visited on January 20, 2004). The same source estimates Summit County's population as 537,238. *Id.* Both are in the Northern District of Ohio but are served by separate court locations.

Counsel pointed out in explanation of its rate that in a recent case it saw involving similarly experienced Akron and Canton attorneys, the Akron attorney from a smaller firm charged $250.00 per hour while the larger firm Canton attorney charged $200.00 per hour.[20] This is the problem and not the answer. The service that is offered is not unusually complex and unavailable, as evidenced by many trustees' willingness to do the work as self-retained counsel at far lower rates. As a result, it is neither logical nor allowable to retain counsel at higher rates due to expensive overhead, the fee expectations of a larger firm or the location in a higher cost-of-living area. Paying for travel time, long distance and similar expenses caused as a result compounds the damage. The court is not accusing Counsel of unfairly concocting a rate. Rather, the point is that Counsel's rate, required by the location, size and nature of the firm, is not justified by the work that is required.

Customers, including legal customers, travel and pay a premium to buy specialized goods and services such as the opera or rare foods. Customers, especially fiduciaries, do not travel to higher-priced areas to buy higher-priced commodities that are equally available in their local market. Legal services in routine and traditional matters are more akin to commonly available commodities than highly specialized goods or services, hence the higher cost is not justified.

## V. Inadequate Coping Mechanisms

Courts have developed several inadequate coping mechanisms for dealing with

---

objection to exemption was an additional service. The disparity for analogous services would be greater.

**20.** Both have skills beyond what is required in the types of cases under discussion.

the fee swamp in routine and traditional matters.

## A. Fifty Percent

One judicial coping mechanism is limiting total trustee and attorney fees and expenses to fifty percent of the estate. This works in the smallest cases but is otherwise of limited utility. Further, it puts the focus on the wrong feature, the number, rather than the practices that produce the number.

## B. Constant Court Reduction

A second coping mechanism is for the court to constantly reduce fees for the trustee and the counsel. This is undesirable. First, it is stressful and time-consuming for all. Legal matters are often stressful and time-consuming, but the goal is to limit unnecessary stress and time. The process has become like frog dissection. While the person doing the dissecting often does not enjoy the experience, it is likely that the frog enjoys it even less.

Second, constant court reduction lacks the reasoning that is the hallmark of fairness and does not provide guidelines that enhance predictability. In short, it does not do a good job of telling people how to process estates so that predictable results follow.

Third, this approach places front line fee responsibility on the court rather than the trustee. This violates common sense and the Bankruptcy Code. *See infra* pp. 211–212.

The result has been inconsistent rates and charges varying by the trustee and the attorney. Counsel stated that the model used in these cases, which the court views as too much per hour for too much service, is not viewed as negatively elsewhere in the Northern District of Ohio. This is not persuasive for two reasons. First, fee rates are higher in other parts of the district. Thus, the amount spent on an hourly basis would not be the issue that it is in Canton.

Second, the argument does not match with historical figures. Federal Rule of Bankruptcy Procedure 2013 requires the Clerk of Court to prepare a Professional Fees Report each year. A review of the Professional Fees Report for 2000, 2001 and 2002 is instructive. It demonstrates that this is not a practice that was developed in Counsel's home area and then exported to other areas. Rather, this program of representing trustees was developed in Canton, not the city in which the firm is located.[21]

The following chart lists the number of cases listed for Counsel as attorney for a trustee in three cities in 2000, 2001, 2002 and part of 2003:

| Year | | Number of Cases by City | |
| --- | --- | --- | --- |
| | Akron | Youngstown | Canton |
| 2000 | 1 | 0 | 23 |
| 2001 | 4 | 1 | 24 |
| 2002 | 1 | 0 | 16 |
| 1/1/2003–10/31/2003 [22] | 3 | 0 | 31 |

**21.** The Professional Fees Report is prepared with limited details and sometimes the Clerk's labeling or characterization requires interpretation. The court exercised a good faith effort to interpret the data fairly.

**22.** Professional Fees Report unavailable until well into 2004. These numbers were the result of running the Professional Fees Awarded Report on the Electronic Case Filing System late in 2003.

The limited information that is available about the judicial staffing of the court in Canton while there was no full time judge assigned to the court also does not support Counsel's argument. The previous judge assigned exclusively to the Canton court retired and the judicial load at this location was carried by other judges in the district for about one year. Judge Harold F. White (hereafter "HFW"), a retired judge from Akron serving on recall, and Judge Marilyn Shea–Stonum (hereafter "MSS"), the sole active duty judge in Akron, handled the bulk of Chapter 7 final reports until the current judge arrived at the end of February 2001. The limited data that is available indicates that the practices that are the current subject of scrutiny were not accepted by other judges from the district during this interim time period.

The following chart, which is admittedly incomplete and based upon information from a limited search, outlines examples of some attorney and trustee compensation requests and allowances for Trustee and Counsel in this time period:

| Case Number | Case Name | Judge | Trustee Requested | Trustee Granted | Attorney Requested | Attorney Granted |
|---|---|---|---|---|---|---|
| 97–63624 | Dice | MSS | $1,213.85 | $ 697.60 | $ 516.25 | Full |
| 98–60188 | Stroud | MSS | $ 376.88 | Full | $ 453.50 | $ 275.00 |
| 98–62980 | Alesiano | MSS | $1,402.67 | $1,000.00 | $1,349.00 | Full |
| 99–60079 | Holben | MSS | $1,567.64 | $1,317.64 | $2,078.25 | $1,312.52 |
| 99–63452 | Capobianco | HFW | $ 881.30 | $ 686.46 | $1,195.50 | $ 947.96 |

In one case, the trustee compensation was reduced by the exact total amount of the attorney fee request. In the others, either the trustee compensation, the attorney fees or both were reduced.

All parties must seek a better way.

## VI. Narrowing the Field of Variables and Differences

The court has already noted the inexplicably broad range of hourly rates charged for the same services. There is also a marked inconsistency between what has been billed as attorney time or not billed because viewed as a portion of trustee duties. This inconsistency is not explainable by rate.

Although this divergence is unusual because it occurs in such a small court, it is not unusual compared to the broad array of practices across the nation. Judge Leif M. Clark noted the many views of trustee duties that are delegable or not delegable and whether an additional charge may be imposed if the duty is delegable. His tour of this minefield in *In re Abraham*, 163 B.R. 772 (Bankr.W.D.Tex.1994) is particularly worth note.

▆▆▆ Some consensus should be reached if the law is to have any meaning. Based upon the foregoing, the court notes the following, both as a decision in this case and as guideposts for future discussion:

1. Attorney and trustee compensation are subject to particular scrutiny for routine and traditional matters when outside counsel is retained.

2. Hourly rates for routine and traditional matters should bear costs similar to those incurred in similar types of routine and traditional matters in fields other than bankruptcy. Consideration may be made if the fee is truly contingent or for other factors including, but not limited to, volume.

3. Attorney compensation for associates in law firms should be considered in the same context as forth in item 2. above. In other words, it is not sufficient that the hourly rate is lowered merely because a less experienced or lower compensated person in a law firm is utilized.

4. Appropriate compensation for the trustee and the attorney for the trustee should consider the extent to which separate counsel requires additional cost in any manner and whether it diminishes the trustee's complete control and factual understanding of the case and its components.

5. Greater involvement of the Office of the United States Trustee (hereafter "UST") in the context of attorney and trustee compensation is desirable where the UST acts primarily as an advocate, rather than the potential for intimidation as a regulator.[23]

6. Increased uniformity as to delegable tasks, compensation for delegated tasks and rates is desirable as it increases predictability.

7. Open consideration should be given to expressed aspirations of the UST, including the potential benefit or detriment of expanding the pool of attorneys used as outside counsel to trustees.

8. The Chapter 7 trustee is responsible for the case and its outcome, including the cost of attorneys and their effect, positive or negative, on the outcome of the case.

9. The Chapter 7 trustee should retain management of decisionmaking and execution of tasks in routine and traditional matters.

The court will apply the holdings of this memorandum opinion prospectively, except to reduce the rate to $185.00 per hour in both cases.

---

**23.** See the congressional testimony of Judge Keith M. Lundin *infra* note 15 and the legislative history of the Bankruptcy Code quoted in

*In re Telesphere Communications, Inc.,* 179 B.R. 544 (Bankr.N.D.Ill.1994) *infra* pp. 211 – 212.